Jacob L. Houmand, Esq. (NV Bar No. 12781)
Email: jhoumand@houmandlaw.com
Bradley G. Sims, Esq. (NV Bar No. 11713)
Email: bsims@houmandlaw.com
HOUMAND LAW FIRM, LTD.
9205 West Russell Road, Building 3, Suite 240
Las Vegas, NV 89148
Telephone:    702/720-3370
Facsimile:    702/720-3371

*Electronically Filed On: September 14, 2022*

*General Bankruptcy Counsel for Shelley D. Krohn, Chapter 7 Trustee*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

In re:

LAS VEGAS LAND PARTNERS, LLC,

Debtor.

Case No. BK-S-19-15333-MKN
Chapter 7

**DECLARATION OF SHELLEY D. KROHN IN SUPPORT OF TRUSTEE'S OMNIBUS OPPOSITION TO: (1) MOTION TO CONVERT CHAPTER 7 CASE TO CHAPTER 11 CASE; AND MOTION FOR ORDER: (1) APPROVING ADEQUACY OF DISCLOSURES IN PROPOSED DISCLOSURE STATEMENT AND (2) SETTING A CONFIRMATION HEARING, RECORD DATE AND DEADLINES FOR BALLOTING AND OPPOSITIONS TO CONFIRMATION**

Date of Hearing:    September 28, 2022
Time of Hearing:    2:30 p.m.
Place: Courtroom No. 2, Third Floor
          Foley Federal Building
          300 Las Vegas Blvd., S.
          Las Vegas, NV 89101

Judge: Honorable Mike K. Nakagawa

I, Shelley D. Krohn, declare as follows:

1.  I am over the age of 18 years and I am competent to make this declaration. I have personal knowledge of the facts set forth herein, except for those facts stated on information and belief and, as to those facts, I am informed and believe them to be true. If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.  I am the appointed Chapter 7 Trustee in the above-captioned bankruptcy case.

-1-

3.  I make this declaration to support the *Omnibus Opposition to: (1) Motion to Convert Chapter 7 Case to Chapter 11 Case; and (2) Motion For Order: (1) Approving Adequacy Of Disclosures in Proposed Disclosure Statement and (2) Setting A Confirmation Hearing, Record Date and Deadlines For Balloting and Oppositions To Confirmation* (the "Motion").[1]

**BACKGROUND OF THE PROPERTY AND THE LEASE AGREEMENT WITH THE RTC**

4.  On or about April 2, 2007, the RTC[2] entered into a lease agreement (the "Lease") concerning the Property. The term of the Lease is 40 years and expires on January 4, 2048.

5.  The Lease is an absolute net lease with a base annual rent of $1,250,000.

6.  The Lease contains mandatory CPI increases to the base rent in years 5, 10, 15, 20, 25, 30, and 35.

7.  On April 28, 2008, FC RTC 39, LLC and FC RTC 20, LLC (collectively, the "Forest City Entities") and Wink One entered into a tenancy-in-common agreement (the "TIC").

8.  Section 2 of the TIC provided that all income/revenue derived from the operation of the RTC Property would be shared by the co-owners in proportion to their respective interests in the RTC Property. Section 9 of the TIC provides that co-owners have a right of first refusal.

9.  On April 28, 2008, the owners of the Property entered into a loan agreement (the "Loan Agreement") to obtain a loan (the "Loan") with CTL Lending Group, LLC ("CTL"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit "1"**.

10. The terms of the Loan Agreement are as follows: (a) principal amount of $25,000,000; and (b) interest rate of 6.95%.

11. The Loan has a 35-year term and a stated maturity date of April 14, 2043.

12. The Loan Agreement allows the borrower to prepay the loan in whole (but not in part) so long as the prepayment included a Yield Maintenance Premium.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure will be referred to as "FRCP" and the Federal Rules of Bankruptcy Procedure will be referred to as "FRBP."

[2] Unless otherwise expressly stated herein, all undefined, capitalized terms shall have the meaning ascribed to them in the Opposition.

13. The Yield Maintenance Premium is defined as the greater of 1% of the principal amount of the loan being prepaid and the present value of the scheduled interest and principal prepayments discounted at the "Reinvestment Yield", which is defined in the Loan Agreement.

14. The Loan has a negative amortization until January 14, 2023. After this date, the ground lease payment owed by RTC is sufficient to begin to pay down the principal of the Loan.

15. All rental payments from the RTC for the Property are made directly to CTL.

16. The interest of the Forest City Entities in the Property was ultimately acquired by Brookfield.

### THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S EFFORTS TO LIQUIDATE THE PROPERTY

17. On August 19, 2019, the Debtor filed a voluntary bankruptcy pursuant to Chapter 7 of Title 11 of the United States Code [ECF No. 1].[3]

18. On August 19, 2019, I was appointed as the Chapter 7 Trustee in the Debtor's bankruptcy case [ECF No. 2].

19. On October 3, 2019, the Debtor filed its bankruptcy schedules [ECF No. 20].

20. The Debtor's Schedule A/B did not identify any real or personal property. *See* Schedule A/B [ECF No. 20], pp. 3-5.

21. I subsequently learned that the Debtor is the sole member of Wink One that, in turn, owns a forty percent (40%) tenant-in-common interest in the Property.[4]

---

[3] All references to "ECF No." are to the numbers assigned to the documents filed in the case as they appear on the docket maintained by the clerk of the court.

[4] *See B&M Land and Livestock, LLC*, 498 B.R. 262 (Bankr. D. Nev. 2013) (holding a Chapter 7 Trustee appointed in a case where a debtor has a membership interest in a single-member limited liability company automatically has the right to manage that company without the need to take further actions to comply with state law); *see also In re Cleveland*, 519 B.R. 304, 306 (D. Nev. 2014 ("Numerous bankruptcy courts have held, and the Court agrees, that where a debtor has a membership interest in a single-member LLC and files a petition for bankruptcy under Chapter 7, the Chapter 7 trustee succeeds to all of the debtor's rights, including the right to control that entity, and a trustee need not take any further action to comply with state law before exercising such control."); *In re Albright*, 291 B.R. 538 (Bankr. D. Colo 2003) (holding that a debtor's bankruptcy filing, where the debtor was the only member of a limited liability company, effectively assigned her entire membership interest in the limited liability company to the

-3-

22. The remaining sixty percent (60%) ownership interest in the Property is owned by Brookfield.

23. On April 17, 2020, I filed an *Application to Employ Colliers International As Real Estate Broker to Sell Certain Real Property and to Pay Commission Pursuant to 11 U.S.C. 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014* [ECF No. 53] that sought to employ Colliers International ("Colliers") to assist with the sale of the Property.

24. On April 20, 2020, Mr. Nype sent an email to my counsel objecting to the employment of Colliers. A copy of the April 20, 2020, email is attached to the Houmand Declaration as **Exhibit "1"**.

25. On April 23, 2020, counsel for Brookfield advised my counsel that Mr. Nype had contacted them seeking to discuss Brookfield's interest in purchasing the Debtor's interest in the Property. Per the email, Brookfield informed Mr. Nype that it would only discuss a sale of its interest with me and my counsel. A copy of the April 23, 2020 email is attached to the Houmand Declaration as **Exhibit "2"**.

26. On or about April 29, 2020, my counsel met with representatives of the RTC and Brookfield. The RTC indicated interest in purchasing the Property. The RTC further indicated that substantial due diligence would need to occur before any sale proposal could occur, and that the RTC could not pay more than the appraised value of the Property.

27. The RTC also indicated that it had experienced a sharp decline in revenue based upon the COVID-19 pandemic and would need to finalize its budget prior to making any offer.

28. On May 7, 2020, Mr. Nype sent an email my counsel further objecting to the hiring of Colliers. A of the May 7, 2020 email is attached to the Houmand Declaration as **Exhibit "3"**.

29. On May 7, 2020, Mr. Nype sent another email to my counsel objecting to the hiring of Colliers. A copy of the May 7, 2020 email is attached to the Houmand Declaration as **Exhibit "4"**.

---

bankruptcy estate, and the Chapter 7 Trustee obtained all of the rights to control management of the limited liability company).

30. On May 13, 2020, I filed a *Notice of Withdrawal of Application to Employ Colliers International to Sell Certain Real Property and to Pay Commission Pursuant to 11 U.S.C. 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014* [ECF No. 61] because Brookfield was interested in a sale of the Property to the RTC, the RTC was open to discussing a purchase of the Property, and due to Mr. Nype having requested that I not employ a real estate broker until a potential sale had been discussed with the RTC.

31. My counsel and representatives from Brookfield then conferred with representatives from the RTC as to the credentials it would require from an appraiser to value the Property. Brookfield and I agreed to employ CBRE, Inc. ("CBRE") as its credentials matched those that would be required by the RTC to evaluate a sale.

32. On September 1, 2020, I filed an *Ex Parte Application to Employ CBRE, Inc. as Appraiser and Pay Fee Pursuant to 11 U.S.C. 327(a), 328(a), and 330 and Federal Rules of Bankruptcy Procedure 2014 and 2016* [ECF No. 69].

33. On September 1, 2020, the Court entered an *Order Granting Ex Parte Application to Employ CBRE, Inc. as Appraiser and Pay Fee Pursuant to 11 U.S.C. 327(a), 328(a), and 330 and Federal Rules of Bankruptcy Procedure 2014 and 2016* [ECF No. 74].

34. On October 6, 2020, CBRE provided its appraisal, valuing the Property at approximately $72 million (the "CBRE Appraisal"). A true and correct copy of the CBRE Appraisal is attached hereto as **Exhibit "2"**.

35. That same day, on October 6, 2020, Mr. Nype immediately sent a flurry of emails to CBRE that the value of the appraisal was too low based on failure to account of potential gaming revenue. Copies of the emails sent by Mr. Nype on October 6, 2020 are attached to the Houmand Declaration as **Exhibit "5"**.

36. On October 9, 2020, a representative of Brookfield contacted my counsel requesting that Mr. Nype not contact Brookfield or CBRE. A copy of the email dated October 9, 2020 is attached to the Houmand Declaration as **Exhibit "6"**.

37. On or about October 12, 2020, counsel for Brookfield sent an email to my counsel complaining of Mr. Nype's interference with the appraisal process:

-5-

> Jacob-
>
> Hope you are doing well.
>
> I know that we spoke a couple months ago regarding Mr. Nype's conduct and his incessant emails in relation to the sale of the RTC property. As you are well aware, Mr. Nype's conduct has continued, and he has recently directed the majority of his correspondence to the appraisal that CBRE conducted on the property. In connection with his correspondence, he has had direct communications with CBRE and suggested that CBRE's appraised value of the property failed to take into account certain gaming variables that will increase the value of the property. As you are readily aware, CBRE is an extremely reputable organization in the real estate industry and was retained by Brookfield, RTC, and the Trustee to appraise the real property. As such, CBRE should not be subjected to Mr. Nype's repeated criticism with respect to its appraisal. This continued interference with CBRE's appraisal must immediately stop as it could detrimentally impact CBRE's finalization of its report. Please take the necessary steps so that Mr. Nype will immediately cease this conduct. While Mr. Nype is a creditor in the bankruptcy estate, he does not currently possess ownership of any portion of the RTC property. He needs to understand that he is not in a position to dictate how the property is to be administered let alone establish the factors in determining the property's appraised value. Should you care to further discuss, please contact me at your earliest convenience.

38. A copy of the October 12, 2020 email from counsel for Brookfield is attached to the Houmand Declaration as **Exhibit "7"**.

39. On October 14, 2020, in response to an email from my counsel requesting that he refrain from contacting Brookfield and CBRE, Mr. Nype again demanded that the CBRE Appraisal include a supplement concerning gaming revenue. A copy of Mr. Nype's email dated October 14, 2020 is attached to the Houmand Declaration as **Exhibit "8"**.

40. On October 14, 2020, after he was explicitly requested to stop emailing CBRE and Brookfield, Mr. Nype sent another email demanding that CBRE increase its appraisal. A copy of the email dated October 14, 2020 is attached to the Houmand Declaration as **Exhibit "9"**.

41. On October 14, 2020, in response to Mr. Nype's email, counsel for Brookfield against sent an email demanding Mr. Nype cease communication with CBRE and Brookfield:

. . .

> Jacob-
>
> Mr. Nype's email is inconsistent with your email to me from yesterday, which expressly stated that Mr. Nype would not reach out directly to Brookfield or CBRE. As previously indicated, Mr. Nype did not retain CBRE to conduct the appraisal, and he does not currently possess title to any portion of the RTC property. CBRE has reached its conclusions independent from Mr. Nype or any other party, and it should remain that way. Please ensure that Mr. Nype ceases from contacting Brookfield or CBRE directly from this point forward. Thank you.

42. A copy of the October 14, 2020 email from Mr. Nype is attached to the Houmand Declaration as **Exhibit "10"**.

43. On October 17, 2020, Mr. Nype sent an email to my counsel, requesting to be put in charge of negotiations and complained about the process of the sale of the Property. A copy of the October 14, 2020 email from Mr. Nype is attached to the Houmand Declaration as **Exhibit "11"**.

44. On October 27, 2020, Mr. Nype sent an email to my counsel where he objected to Brookfield's request that he not participate in the discussions regarding the sale of the Property. A copy of the October 27, 2020 email from Mr. Nype is attached to the Houmand Declaration as **Exhibit "12"**.

45. On November 4, 2020, Mr. Nype sent an email to my counsel, again objecting to not being allowed to lead discussions regarding the sale of the Property. A copy of the October 27, 2020 email from Mr. Nype is attached to the Houmand Declaration as **Exhibit "13"**.

46. After the RTC received a copy of the CBRE Appraisal, my counsel and representatives from Brookfield participated in several conference calls with the RTC. Representatives from the RTC also discussed the possibility of assuming the Loan with CTL.

47. On or about March 17, 2021, the RTC made an offer to purchase the Property by paying the Debtor's bankruptcy estate and Brookfield for $2,750,000 and assuming the obligations under the Loan.

. . .

. . .

### MR. NYPE AGREES TO NOT AMEND HIS CLAIM IN A MANNER THAT WOULD REDUCE THE TRUSTEE'S COMMISSION

48. On May 27, 2021, I filed a *Stipulation Regarding Proof of Claim 2-1 Filed by Russell L. Nype* [ECF No. 83] (the "Stipulation") that provided Mr. Nype would be precluded from withdrawing or amending proof of claim 2-1 in a manner that reduced the amount owed to Mr. Nype.

49. The intention of the Stipulation was to prevent a scenario in which Mr. Nype amends his proof of claim in a manner that would reduce my commission. This is because Mr. Nype and I were negotiating a settlement with one of the Debtor's principals concerning the fraudulent transfer judgment that would have provided any surplus payment that would be owed to one of the Debtor's principals by virtue of Section 726(a)(6) be paid directly to Mr. Nype. Since Mr. Nype was, at the time, the holder of approximately ninety-eight percent (98%) of the Debtor's creditor body, I did not want such a settlement to be approved and then have Mr. Nype withdraw his proof of claim to avoid having to pay my commission.

50. On May 27, 2021, the Court entered an *Order Approving Stipulation Regarding Proof of Claim 2-1 Filed by Russell L. Nype* [ECF No. 85].

### THE TRUSTEE AND BROOKFIELD EVALUATE THE PURCHASE OFFER FROM THE RTC

51. After I received the purchase offer from the RTC, I interviewed three separate brokers to determine whether it was the highest and best offer for the bankruptcy estate's interest in the Property.

52. Specifically, myself and representatives for Brookfield discussed the offer from the RTC and the CBRE Appraisal with CBRE, Colliers, and Hilco Real Estate, LLC.

53. While I was evaluating the offer from the RTC with other brokers, I asked Mr. Nype whether he would be interested in purchasing the bankruptcy estate's interest in the Property. Mr. Nype never made an offer to purchase the bankruptcy estate's interest in the Property.

. . .

. . .

-8-

### THE TRUSTEE EMPLOYS CUSHMAN AND A CONSULTANT

54. On or about October 12, 2021, Mr. Nype sent me an email where he protested the fact that I was interviewing several brokers and requested that the Trustee employ Cushman to sell the Property.

55. After meeting with Cushman, Brookfield and I agreed to employ Cushman with a one-year listing agreement to see if they could successfully market the Property to the RTC.

56. On March 4, 2022, I filed an *Application to Employ Cushman & Wakefield U.S., Inc. dba Cushman & Wakefield as Real Estate Broker Pursuant to 11 U.S.C. 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014* [ECF No. 88].

57. On April 7, 2022, the Court entered an *Order Granting Application to Employ Cushman & Wakefield U.S., Inc. dba Cushman & Wakefield as Real Estate Broker Pursuant to 11 U.S.C. 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014* [ECF No. 104].

58. Since its employment, Cushman has also reviewed significant documentation concerning the Property including, but not limited to, the operating agreement for Wink One, LLC, the TIC Management Agreement, the lease agreement with the RTC, the loan agreement with CTL Lending Group, LLC, and the appraisal prepared by the CBRE.

59. This review led to the conclusion that a sale of the Property to the RTC would result in the highest recovery to the Debtor's bankruptcy estate and Brookfield.

60. Following this conclusion, Cushman began developing a sale proposal to present to the RTC. This process has included weekly conference calls with the Trustee and her counsel.

61. Cushman has also had numerous conference calls with executives from Brookfield to develop a sale proposal to present to the RTC.

62. Cushman also recommended that I employ Alisa Nave, LLC (the "Nave Firm") as a consultant to assist with the sale of the Property due to its extensive experience in government affairs and existing relationships with RTC commissioners.

63. On July 14, 2022, I filed an *Application to Employ Alisa Nave, LLC As Consultant for Shelley D. Krohn, Chapter 7 Trustee, Pursuant to 11 U.S.C. 327(e) and 328(a) and Federal Rule of Bankruptcy Procedure 2014* [ECF No. 113]

-9-

Case 19-15333-mkn    Doc 134    Entered 09/14/22 16:44:04    Page 10 of 11

64. On July 28, 2022, the Court entered an *Order Granting Application to Employ Alisa Nave, LLC As Consultant for Shelley D. Krohn, Chapter 7 Trustee, Pursuant to 11 U.S.C. §§ 327(e) and 328(a) and Federal Rule of Bankruptcy Procedure 2014* [ECF No. 123].

65. On August 16, 2022, representatives from Cushman traveled to Las Vegas, Nevada from New York and met with representatives from the RTC to discuss a sale of the Property. During this meeting, representatives from the RTC expressed an interest in purchasing the Property.

66. On August 25, 2022, nine days after the meeting with the RTC, Mr. Nype filed the Motions wherein he requests that the Debtor's bankruptcy case be converted to Chapter 11 and he be placed as the manager for the Debtor and Wink One.

67. Mr. Nype filed the Motions without discussing the same with myself, Cushman, the Nave Firm, or my counsel.

68. On September 7, 2022, representatives from Cushman attended a conference call with representatives from the RTC where the parties agreed to a process to evaluate a sale price for the Property.

69. Specifically, the RTC has also ordered two appraisals of the Property to evaluate a sale price for the Property, which is a requirement under its rules and regulations.

70. The RTC has also informed Cushman that they will be engaging representatives from the Federal Transit Administration with the sale process for the Property.

71. Finally, representatives from the RTC have also agreed to have bi-monthly conference calls with Cushman so that the parties can discuss a sale of the Property.

72. I believe that the Motions were filed in bad faith and only seek to deprive me of receiving my commission that is owed pursuant to Section 326.

73. Mr. Nype has repeatedly interfered in my ability to administer the Debtor's bankruptcy case by, among other things, contacting representatives for Brookfield and the CBRE.

. . .

. . .

. . .

-10-

74. Accordingly, the Motions should be denied in their entirety and I should be permitted to continue my efforts to liquidate the Property in the context of a Chapter 7 bankruptcy case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 4 day of September, 2022.

*Shelley D. Krohn*, Chapter 7 Trustee

-11-