LENARD E. SCHWARTZER (NV Bar No. 0399)
JASON A. IMES (NV Bar No. 7030)
Schwartzer & Imes Law Firm PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Telephone: (702) 228-7590
Facsimile:  (702) 892-0122
Email: efilings@sailawfirm.com
*Counsel for Russell Nype*
  *and Revenue Plus, LLC, Plan Proponents*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No. BK-S-19-15333-MKN |
| LAS VEGAS LAND PARTNERS, LLC, | Chapter 11 |
| Debtor. | **REPLY BRIEF IN SUPPORT OF MOTION TO CONVERT CHAPTER 7 CASE TO CHAPTER 11 CASE** |
| | Hearing Date: September 28, 2022 Hearing Time: 2:30 p.m. |

RUSSELL NYPE and REVENUE PLUS, LLC (collectively, "Creditors" or "Movants"), by and through their counsel, Schwartzer & Imes Law Firm PC, pursuant to Bankruptcy Code §706(b), file this Reply Brief in Support of Motion to Convert Case of LAS VEGAS LAND PARTNERS, LLC ("Debtor") from a Chapter 7 case to a Chapter 11 case (ECF 125) so that a Plan of Reorganization can be considered and confirmed.

There is no dispute that the Debtor's estate has an indirect interest in the real property on which the Bonneville Transit Center is located (the "Property") through a wholly owned limited liability company—Wink One, LLC.

There is no dispute that in more than three (3) years the Trustee has been unable to sell this indirect interest of the Debtor in the Property.

There is no dispute that the movants are the **only pre-petition creditors** of

this Debtor and that the Debtor owes the Creditors more than $10,200,000.00 for breach of contract, fraudulent transfers and special damages for fraud.

There is no dispute the only funds collected by the Trustee came as a result of the litigation financed by the Creditors.

The Creditors believe that the Trustee should have approximately $110,000.00 in funds. There still has been no accounting provided by the Trustee of the funds in her care. Nor has the Trustee's counsel provided any estimate of the legal fees incurred by the Debtor's estate.

There is no dispute that Creditors (the Plan Proponents) are only the pre-petition creditors of the Debtor who have a claim in this case.

There is no dispute that the Trustee has had three (3) years to sell the Debtor's interest in the Property. To date, she has been unsuccessful. At best, the Trustee hopes to have a sale negotiated sometime in the future.

The Creditors assert that it is time to turn over the sales efforts to the Creditors because of (a) the Trustee's delay in or inability to liquidate the Debtor's interest in the Property and (b) to avoid a substantial trustee's commission on the transactions related to a future sale of the Property.

The Trustee seeks to continue her so far ineffective sales efforts with no time limit to earn a large commission on highly leveraged property.[1]

There is no dispute that (1) both David Mitchell and his attorney, (2) the trustee in the Liberman case, (3) Cushman and (4) Alisa Nava were served with the Motion and did not file any opposition. The only opposition came from the Trustee and her counsel.

---

[1] The Trustee's Opposition does not dispute that the Trustee intends to earn a commission based, in part, on the payment of the $25,000,000.00 loan from CTL secured by the Property owned by Wink One LLC and not just the net payment received by the Debtor's estate.

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

**SCHWARTZER & IMES LAW FIRM PC**
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

The dispute is about the Trustee's fiduciary duty to the only remaining Creditors and the Trustee's allegation that the reason she hasn't sold the Property owned by Wink One, LLC in the past three (3) years is interference by Russell Nype, the principal of the Creditors. This last allegation is not supported by any evidence of any contact between Russell Nype with any representative of the RTC or any other potential buyer.

## RESPONSE TO TRUSTEE'S ARGUMENTS

### 1. <u>Trustee Did Not Employ CBRE as Realtor Because of Nype</u>

The Trustee infers that Nype did some wrong by pointing out that CBRE should not have been employed as realtors in 2020. However, the Exhibits to Houmand's Declaration show the opposite.

Exhibit 1 (ECF 135-1)-Email from Nype dated April 20, 2020 to Trustee and her counsel objected to employment of Colliers "until we discuss what is services are to be expected from them and an appropriate fee as I have written you." At that time the Trustee was proposing to pay Collier's a commission of "(a) 5% of $10 million and below; (b) 4% of $10 million to $25 million; (c) 3% of $25 million to $50 million; and (d) 2% of any amount in excess of $50 million." See APPLICATION TO EMPLOY COLLIERS INTERNATIONAL (ECF 53, page 5 paragraph 17).

Exhibit 3 (ECF 135-3)-Email from Nype dated May 7, 2020 includes:

> "I completely disagree there is any basis for hiring Colliers at this time. …and until we have direct principle to principle discussions there is no basis for hiring Colliers."

Exhibit 4 (ECF 135-4)-Email from Nype dated May 7, 2020 includes:

> "I believe Colliers is a very good resource if needed.  Let's see if we need them."

///

///

1   No opposition to this Application was filed by Nype. The Trustee withdrew

2   the Application on May 13, 2020. (ECF 61).

3   No progress in meeting with any of the principals of the RTC was reported in

4   2020 and, if there were actual negotiations with any principals of the RTC they were

5   not reported to Nype. It is the Creditors understanding that the Trustee's counsel

6   (not the Trustee) met with an outside counsel of the RTC which accomplished

7   nothing.

8   The record reflects that Nype was correct about the proposed fees of Colliers.

9   Subsequently, the Trustee employed Cushman (with the Creditors' cooperation)

10  whose proposed fee is substantially lower than the one proposed by Colliers.  It is

11  "one percent (1%) of the total sales price of the Property. See APPLICATION TO

12  EMPLOY CUSHMAN & WAKEFIELD U.S., INC. DBA CUSHMAN &

13  WAKEFIELD (ECF 88, page 5, paragraph 18).

14  Exhibit 2 (ECF 135-2)-Email from J. Sabatine, counsel for Brookfield, dated

15  April 23, 2020, states:

16  "In January [2020], a broker from Collier's contacted
    Brookfield about the Russell Nype judgment in the Nype-
17  Mitchell lawsuit which led to our counsel discovering the
    filing of the LVLP bankruptcy."
18

19

20  Apparently,  from August 2019 until January 2020, the Trustee had not

21  contacted the co-owner of the RTC Property.

22  **2.  Trustee's Current Efforts Won't Result in a Sale This Year.**

23  To date, the only offer that the Trustee has received from the RTC is an offer

24  made on March 17, 2021, to purchase the interests of both the bankruptcy estate and

25  Brookfield in the amount of $2,750,000.00. See Trustee's Opposition (ECR 133,

26  page 12, paragraph 44).

27  The Declaration of Larry Wilks shows that there was, finally, a meeting in

28  August 2022 "with [unnamed] representatives from the RTC to discuss a sale of the

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

Property" and the "[unnamed] representatives from the RTC expressed an interest in exploring the purchase of the Property." This makes clear that at this point there is no offer and further progress depends on appraisals and negotiations between the RTC and the Federal Transit Administration.

No explanation was given why this meeting with RTC didn't take place 2 or 3 years ago. Nype, in his 2020 emails to the Trustee repeatedly requested that there be such a meeting. See Exhibits 3 and 4 to Houmand Declaration (ECF 135-3 and ECF 135-4). Nype asked in an email to Trustee's counsel dated November 4, 2020, "who at or representing the RTC have my representatives been discussing this transaction with the RTC?" (ECF 135-13). No response came from Trustee's counsel.

What has worried Nype is the Trustee's and her counsel's inexperience. He expressed this in the Email dated September 14, 2022 (ECF 135-11), in which he stated:

> With no offense intended I have a trustee who has never successfully completed a transaction like the RTC, you Jacob you have told me this is a new area for you, Stephanie [Sluzala who worked for Brookfield] is very junior. And I have done this for over 30 years, owns 40% of the asset and was a part of developing the initial relationship/lease with the RTC.

Based on this past performance of the Trustee and her counsel, Nype lost faith in their ability to liquidate the Debtor's remaining asset for an amount that will result in a substantial distribution to Creditors. Importantly, Tara Stracom, the senior person on the Cushman project team attempting to sell the Property states in her Declaration:

> 6.    Larry Wilks and I are not of the opinion as seasoned real estate professionals that there is any potential for a transaction with the Regional Transportation Commission of Southern Nevada (the "RTC") regarding the Bonneville Transit Center property to close in 2022.

7.    In this instance it's even more complicated than usual given the federal government involvement and multiple parties.

8.    If Mr. Wilks' Declaration gave the impression that the sale to the RTC could occur in 2022, it was not our intention.

**3.    Conversion Provides Benefits to Creditors by Reducing Administrative Costs and Transferring Control of Sales Process**

Despite the arguments of Trustee, the benefit to Creditors from conversion are apparent. They consist of (a) reduced administrative expenses and (b) control over the sale. The Trustee is hoping to conduct a sale of the Debtor's interest in the Property. The Debtor's interest, as described by the Trustee's counsel in the Trustee's Opposition (ECR 133, page 9-10, paragraphs 1-13), is complicated.  It consists of a 100% interest in Wink One, LLC which owns a 40% interest in Property subject to (a) a large debt secured by a deed of trust, (b) a tenant in common agreement with Brookfield and (c) a long term lease to the RTC. All parties recognize that the value of this interest can most likely be obtained from the sale of the property to the RTC.  However, there is no guarantee that the RTC will make an acceptable offer. There is a distinct possibility that the financial benefit of ownership will only come to pass at the end of the RTC lease (in 2048) when the secured debt has been paid in full and the RTC has to renegotiate its lease of the Bonneville Transit Center.

**4.    Continuing Loss to or Diminution of Estate**

Except for the funds recovered by special counsel in March 2020, the bankruptcy estate is continuing incur legal fees[2] in a case with no positive cash flow creating a continuing loss for the bankruptcy estate.

---

[2] The amount of legal fees incurred to date is not known by the Creditors as Trustee's counsel has refused to provide that information despite two requests.

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

For this reason, ordering conversion and confirming the proposed Plan of Reorganization benefits Creditors whether a sale occurs in 2023.

The issue of control becomes important when a decision must be made after an offer. The Creditors assert that the Creditors should make that decision unfettered by the Trustee or the Court because the Creditors are the parties entitled to the recovery. The Trustee wants to retain the decision-making authority (subject to Court approval).

The issue of control becomes important if no offer is made by the RTC. In that event, the Trustee will either (1) close the case of the Debtor which results in either (a) return of the Debtor's assets to the Debtor still controlled by Mitchell and Liberman pursuant to Bankruptcy Code §554(c) or, more likely, (b) the Debtor's interest in Wink One LLC and the Property will remain property of the Debtor's bankruptcy estate pursuant to Bankruptcy Code §554(d) because the Debtor's didn't list its ownership of Wink One, LLC in its schedules[3] or (2) keep the case open until someone makes an acceptable offer to purchase Wink One or the Property. Neither approach benefits the Creditors as much as confirmation of the proposed Plan of Reorganization which puts the Creditors in control of the disposition of the remaining assets of the Debtor.

### 5. Conversion Does Not Harm the Debtor

By allowing conversion and confirmation of the proposed Plan of Reorganization the Debtor will no longer be a debtor in a bankruptcy case. It will be a reorganized entity. As a reorganized entity it will not need to have bankruptcy counsel, will not need to incur any additional commission to the Trustee and will not need to incur fees of Trustee's counsel. For one quarter, it will incur minimal fees to

---

[3] The Debtor's Schedules are located at ECF 20 and the Debtor's Amended Schedules are located at ECF 37 and ECF 43.

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

the United States Trustee based on payment of the administrative claims allowed by this Court.[4]

If the case remains in Chapter 7, the Debtor will not receive a discharge because it is not an individual. Bankruptcy Code §727(a)(1). If the case is converted and the proposed Plan is confirmed, the Debtor will not receive a discharge because it is not an operating business. Bankruptcy Code §1141(3)(A). Either way, the Debtor is not discharged.

## 6. <u>Conversion Does Not Harm the Debtor's Estate</u>

Considering the purpose of bankruptcy, one would think it would be hard to argue that converting a case so that a debtor can be reorganized is harmful to a debtor's estate. The estate will cease to exist because the Debtor is reorganized.

The Plan provides for the payment of administrative expenses and assumption of the two existing contracts of the estate with Cushman and with Alisa Nave.[5] The bankruptcy estate is relieved of any claims by these contracting parties. Bankruptcy

_____

[4] The proposed Plan of Reorganization provides:

  8.08 <u>Closing Case</u>:  The case shall be closed upon the payment of all administrative claims and priority claims.

[5] 6.01 <u>Assumed Executory Contracts and Unexpired Leases</u>:
  (a)    The Debtor will assume the following executory contracts as of the Effective Date:
  Realtor:  *Cushman & Wakefield U.S., Inc. dba Cushman & Wakefield*
  Consultant:  *Alisa Nave, LLC*
  ***
  (c)    This Plan does not reject or otherwise amend the existing lease of the Property to the RTC.
  (d)    This Plan does not reject or otherwise amend any existing agreement between the Debtor (or debtor's bankruptcy estate) and Forest City Realty Trust, LLC ("Forest City"), the owner of the remaining sixty percent (60%) tenant-in-common interest in the Property.

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Code §365(k). The lease with the RTC and the tenant in common agreement with

2  Brookfield are contracts of Wink One, LLC and are not affected by the Plan.

3  **7.  Conversion Does Not Harm Members of The Debtor.**

4  Under the proposed Plan of Reorganization, the members retain their

5  membership in the Debtor. Technically, they are unimpaired. In fact, whether a plan

6  is confirmed or not, one half of the members (David Mitchel) will have this

7  membership interest subject to a charging order in favor of Nype. For that reason,

8  Nype (who has a $20 million judgment against both Mitchell and Liberman) has the

9  most incentive to maximize recovery in this case. Neither member of the Debtor has

10  contested the Motion to Convert.

11  **8.  Conversion Does Not Harm the Trustee or Her Counsel**

12  As provided in the proposed Plan of Reorganization, the Trustee and her

13  counsel will be paid their commission, fees and costs as approved by the Court. See

14  Sections §5.06 and §7.01. While the Trustee may desire to have a commission based

15  upon a future sale of the Property, she does not have a legal right to such

16  commission until she actually sells the Debtor's interest in the Property. Nor does

17  Trustee's counsel have a legal right to incur future legal fees and costs after

18  conversion.

19  **9.  Conversion is Proper Because it Will Result in Reorganization**

20  Liquidating plans of reorganization are confirmable. Bankruptcy Code

21  §1123(b)(4) specifically provides that a plan may provide for—

22  
23      (4) provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests;

24  

25  *See Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108-09

26  (B.A.P. 9th Cir. 1986) (noting that liquidating plans are permitted by the statute

27  "and can be proposed in good faith"; affirming confirmation of

28  creditors' liquidating plan over the debtors' objection); *In re Plant Insulation Co.*,

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

469 B.R. 843, 863 (Bankr. N.D. Cal. 2012) ("Proper use of Chapter 11 is not limited to cases in which the debtor preserves going-concern value. The Bankruptcy Code expressly authorizes the confirmation of a liquidating plan in a Chapter 11 case. A liquidating plan furthers other policies embodied in the Bankruptcy Code: the orderly disposition of assets to maximize value, and the equal treatment of claims of similar priority. The decisions upholding liquidating plans indicate that a plan need not satisfy all of the goals of chapter 11 to be in good faith." (citations omitted)), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013); *In re Coastal Equities, Inc.,* 33 B.R. 898, 904 (Bankr. S.D. Cal. 1983) ("Clearly the term "reorganization," as used in Chapter 11 of the Code, encompasses the systematic liquidation of a debtor.").

The Trustee's Opposition attempts to conflate the provisions of Bankruptcy Code §706(b)[6] and Bankruptcy Code §1112(b)[7].  §706(b) does not limit conversion when the goal is confirming a liquidating plan. Most of the cases, cited by in the Trustee Opposition, are inapplicable. Most of them involved conversion under §1112(b). *Loop Corp., In re Western States, The V Companies, The Adbrite Corporation* and *R & S)* were cases concerned with conversion from Chapter 11 to Chapter 7 under §1112(b). *Wallace*, *Creekside Senior Apartments*, and *Vallambrosa Holdings* were cases concerned with grounds for dismissal of a Chapter 11 case under §1112(b).

*In re Woodruff* , 580 B.R. 291 (Bankr. M.D.Ga. 2018), held that a debtor's motion to convert his case to one under Chapter 11 pursuant to §706(a), after debtor's no-asset case was reclassified as one that might produce distribution to

---

[6] (b) On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time.

[7] A list of "causes" for dismissing a Chapter 11 case or for converting a case from Chapter 11 to Chapter 7.

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    creditors based on his inheritance of stock valued at $120,000, could be denied as

2    futile, as likely to lead only to dismissal or re-conversion. Relying on *Marrama v.*

3    *Citizens Bank*,  549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007), the

4    *Woodruff* court found that if it had grounds to reconvert a case back from Chapter

5    11 to Chapter 7 at the time of the hearing on the motion to convert the case to

6    Chapter 11 it need not allow the Debtor, under 706(a), to convert the case.  In

7    *Woodruff,* the individual debtor didn't have income to fund a plan of reorganization

8    and the Court found that the expense of reorganization case made it likely that the

9    case would have to be re-converted and that the conversion would result in a waste

10   of time and money. In *Woodruff,* the court reasoned that a Chapter 11 "would

11   accomplish nothing more than a liquidation of the estate's assets but would impose

12   additional costs and delay on creditors." *Id.* at 300. In the case before this Court,

13   those factors do not exist as the Plan and Disclosure Statement are already drafted

14   and filed and the Chapter 11 case should exist for only the time necessary to confirm

15   the proposed Plan of Reorganization. The evidence before this Court does not

16   support such denial of conversion.

17        In *Braunstein v. Waller,* 2012 WL 1802145 (N.D.Ill 2012), the district court

18   upheld the bankruptcy court's denial of conversion from Chapter 7 to Chapter 11 by

19   a debtor under §706(a) and stated:

20                In the instant appeal, Braunstein has failed to show that a
             conversion in the bankruptcy proceedings would have been
21           anything other than an exercise in futility. Braunstein has
             also failed to show that he should have been allowed to risk
22           dissipation of the Estate assets in Chapter 11 proceedings.
23

24   *Id.* at *2. In the case before this Court, those factors do not exist as the Plan and

25   Disclosure Statement are already drafted and filed and the Chapter 11 case should

26   exist for only the time necessary to confirm the proposed Plan of Reorganization.

27   The evidence before this Court does not support such denial of conversion.

28

*In re Watkins,* 132 B.R. 781 (Bankr. S.D.Fla. 1991), the court denied a conversion motion by the Chapter 7 trustee not only because the court held that it was not compatible with the purpose of chapter 11, but because it didn't help the individual debtor and because of the administrative expenses which would be incurred in a chapter 11 case. The court stated:

> Conversion of the case will not aid the debtor in a reorganization effort and, at this point, will only serve to expedite the closing of the case.
>
> Additionally, the Court is concerned with the administrative expense that will accrue by virtue of the conversion. The estate will have to the bear the cost of the preparation and filing of the disclosure statement and plan, with the only anticipated benefit being that the trustee will be permitted to begin making interval distributions to creditors following confirmation. While the Court is certainly interested in seeing that the creditors receive their distributions in an expeditious manner, in this case this interest is outweighed both by the Court's duty to comply with the purpose behind Chapter 11 of the Bankruptcy Code and the Court's concern with maintaining administrative costs within reasonable measure.

*Id.* at 782. In this case, the plan and disclosure statement have been prepared (at no expense to the estate) and the benefit to the Creditors has been shown.

In *In re Gordon*, 465 B.R. 683 (Bankr. N.D. Ga. 2012), the Court granted a creditor's motion to convert an individual's Chapter 7 case to Chapter 11 pursuant to §706(b) over the objection of the debtor when "conversion of this case to one under Chapter 11 is in the best interest of all the creditors, as it will maximize the Debtor's estate." *Id.* at 692. In the case before this Court, the same applies.

## 10.  The Motion to Convert And The Proposed Plan of Reorganization Is Not Proposed In Bad Faith

"Standing on one's legal rights or zealously and aggressively pursuing those rights is not indicative of bad faith." *In re Claar Cellars LLC*, 623 B.R. 578, 601

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    (Bankr. E.D. Wash. 2021).  See also *In re Plant Insulation Co.*, 469 B.R. 843

2    (Bankr. N.D. Cal.), *aff'd,* 485 B.R. 203 (N.D. Cal. 2012), *rev'd,* 734 F.3d 900 (9th

3    Cir. 2013), and *aff'd,* 544 F. App'x 669 (9th Cir. 2013):

> Proper use of Chapter 11 is not limited to cases in which the debtor preserves going-concern value. The Bankruptcy Code expressly authorizes the confirmation of a liquidating plan in a chapter 11 case. §§ 1123(a)(5)(D), 1141(d)(3)(A). A liquidating plan furthers other policies embodied in the Bankruptcy Code: the orderly disposition of assets to maximize value, and the equal treatment of claims of similar priority. *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 120 n. 4 (3rd Cir.2004). The decisions upholding liquidating plans indicate that a plan need not satisfy all of the goals of chapter 11 to be in good faith.

469 B.R. at 863.

A plan is proposed in good faith as long as it "satisfies the purposes of the bankruptcy code," *In re Gen. Teamsters, Warehousemen, and Helpers Union, Local 890,* 265 F.3d 869, 877 (9th Cir.2001)., and the review focuses on the "totality of the circumstances." *In re Sylmar Plaza, L.P.,* 314 F.3d 1070, 1074 (9th Cir.2002).

In this case, the Creditors have proposed a confirmable Plan of Reorganization which not only can be consummated but is workable.

**11. <u>There are Clear Reasons for Appointment of a Chapter 11 Trustee</u>**

Even though the appointment of a Chapter 11 trustee does not affect the Chapter 7 trustee, the Trustee objected to the appointment of a Chapter 11 trustee.

The reason for appointment of a Chapter 11 trustee in this case is to prevent the former managers who have been found to be dishonest regaining control of the Debtor's estate. The State Court judge, after a trial, found:

> 39. The evidence also demonstrates that Mitchell, Liberman and the Related Entities engaged in conscious ~ concerted and ongoing efforts to conceal, hide, convey,

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

keep secret and/or divert millions of dollars in assets away from Nype and/or other creditors.

40. The evidence also demonstrates that Mitchell, Liberman and the Related Entities engaged in conscious, concerted and ongoing efforts to ensure that funds and/or assets that would otherwise be available to Nype to satisfy his claims (and Judgment) were kept away from Nype.

41. The evidence demonstrates that Mitchell, Liberman and the Related Entities distributed in excess of $15,000,000 in funds that should have been available to satisfy Nype's claims/Judgment.

See Amended Findings of Fact and Conclusions of Law, attached as Exhibit 1, pages 5-6.

19. The Court concludes that the evidence demonstrates that:

a. Mitchell and Liberman, engaged in conscious, concerted and ongoing efforts to conceal, hide, convey, keep secret and/or distribute millions of dollars in assets away from Nype;

b. Mitchell and Liberman received distributions from LVLP and the Related entities;

c. Mitchell, fabricated and backdated evidence to facilitate the destruction and/or concealment of material financial evidence by his agent that would have greatly assisted Nype's case.

d. But for Nype's pretrial discovery, the fabrication of evidence would not have been uncovered.

See Amended Findings of Fact and Conclusions of Law, attached as Exhibit 1, page 12.

Bankruptcy Code §1104(a) provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, **either before or after the commencement of the case**, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

The findings and conclusions of the State Court judge provide the evidentiary basis for appointing a Chapter 11 trustee in this case as Mitchell and Liberman engaged in fraud and dishonesty when they controlled the Debtor. Mitchell also engaged in dishonesty post-petition when he signed schedules under penalty of perjury which omitted the Debtor's interest in multiple entities, particularly, Debtor's 100% ownership of Wink One LLC.

Bankruptcy courts have held "Debtor's failure to file timely and accurate financial disclosures as a factual basis for its findings under both § 1104(a)(1) and § 1104(a)(2)." *In re Grasso*, 490 B.R. 500, 519–20 (Bankr. E.D. Pa. 2013). See also *Tradex Corp. v. Morse*, 339 B.R. 823, 833 (D. Mass. 2006), which held:

Consequently, "[w]here, as here, the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required." *Id.; see In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir.1988) ("It is also established that failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee."); *Ford,* 36 B.R. at 504 ("Inherent in debtor's fiduciary obligations under the Code is the duty to file accurate financial reports disclosing all transactions involving estate assets.... Any failure to file accurate financial statements is an omission contributing to cause for appointment of a trustee."); *see also Sanders,* 2000 WL 329574, at *4, 2000 Bankr. 263, at *11 ("Where a debtor fails to disclose material information to the Court and to the

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

creditors, the appointment of a chapter 11 trustee is appropriate. Misrepresenting the facts of a debtor's financial situation constitutes grounds for the appointment of a trustee.").

*See also Petit v. New England Mortgage Services,* 182 B.R. 64, 69–70 (D.Me. 1995) ("Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process.... Therefore, where the Debtor fails to disclose material and relevant information to the Court and creditors, a Chapter 11 trustee is required."); *In re Sharon Steel Corp.,* 871 F.2d 1217, 1228 n. 15 (3rd Cir.1989) ("The trustee and the committee also cite a number of cases maintaining that inaccurate, incomplete recordkeeping alone amounts to cause requiring appointment of a trustee under 11 U.S.C. § 1104(a)(1).") (Collecting cases.); *In re Deena Packaging Industries, Inc.,* 29 B.R. 705, 707 (Bankr. S.D.N.Y. 1983) ("Section 1104 ... specifically proscribes certain conduct by debtors in possession; dishonesty is one such enumerated, prohibited act.... [T]he trial record reveals that Deena's failure to include relevant financial data on their original and amended schedules raises questions of dishonest conduct."); *In re Plaza de Retiro, Inc.,* 417 B.R. 632, 641–42 (Bankr. D.N.M. 2009).

In addition, Mitchell and Liberman must be replaced by a trustee because they have a conflict of interest.  As shown by Exhibit 1, the Debtor's estate is one of the Plaintiffs who were awarded $19,641,515 in damages against Mitchell and Liberman. Such a conflict of interest mandates the appointment of a Chapter 11 trustee. *In re LHC, LLC*, 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013); *see also In re L.S. Good & Co.,* 8 B.R. 312, 315 (Bankr.N.D.W.Va.1980) (appointing Chapter 11 trustee due to potential conflicts of interest between management and the estate); *Matter of Fiesta Homes of Georgia, Inc.,* 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the Debtor in Possession from administration of this case."); *In re Nautilus of New Mexico,*

*Inc.,* 83 B.R. 784 (Bankr.N.M.1988) (concluding that co-owner president's conflict of interest made him incapable of dealing with debtor as a fiduciary and appointing Chapter 11 trustee); *In re Key Airlines, Inc.,*1993 WL 13003251, at *6 (Bankr. S.D. Ga. 1993) (same).

Under §1104(a)(1), some courts hold appointment is mandatory when cause is found. *Oklahoma Refining Co. v. Blaik (In re Oklahoma Refining Co.),* 838 F.2d 1133, 1136 (10th Cir.1988) (Once cause is found the Court has no discretion and must appoint a trustee.); *In re Bonham*, 2021 WL 6425277, at *8 (Bankr. D. Colo. 2021) (same); *In re Peak Serum, Inc.*, 623 B.R. 609, 621 (Bankr. D. Colo. 2020) (same); *Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009) (same).

Other courts hold that a cost-benefit analysis should be made. See *Committee of Dalkon Shield Claimants v. A.H. Robins Co.,* 828 F.2d 239, 242 (4th Cir.1987) (determining that the court's discretionary authority is necessary to determine if the "conduct shown rises to a sufficient level to warrant the appointment of a trustee."). The appointment of a trustee for a short period will not be a substantial burden.

Using either standard, a Chapter 11 trustee should be appointed in this case (for the relatively short period the Debtor will remain in Chapter 11) to avoid allowing Mitchell and Liberman from taking control of the debtor and its assets.

### SUMMARY

Reduced to its core, the Trustee's and her counsel's position amounts to an argument that her interest in (or desires for) a larger commission and additional attorney's fees should be paramount to the interests of creditors.  Creditors fear that this case will become a reprise of *Jarndyce and Jarndyce*, the fictional suit in Dickens' *Bleak House* where only the professionals profited. As stated in *Proudfoot Consulting Co. v. Gordon (In re Gordon),* 465 B.R. 683, 692 (Bankr.N.D.Ga. 2012) (quoting *In re Lobera,* 454 B.R. 824, 854 (Bankr.D.N.M. 2011)):

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 891 46-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

> "Since there are no specific grounds for conversion, a court 'should consider anything relevant that would **further the goals of the Bankruptcy Code.**'"

This Court has reviewed similar situations.  In *In re, R & S St. Rose Lenders LLC*, 2016 WL 3536533, at *6 (Bankr. D. Nev. May 18, 2016), this Court considered conversion to Chapter 7 when a Chapter 11 debtor was proposing a liquidating plan of reorganization.  In *R & S St. Rose Lenders,* this Court balanced the benefits and detriments of keeping the case in Chapter 11 by comparing the administrative costs of liquidating assets. It stated:

> What happens if Lenders' Chapter 11 proceeding is converted? A chapter 7 trustee would be appointed to administer the Sale Proceeds. Assuming those proceeds are approximately $12,000,000, the trustee's compensation would be up to $383,250 under Section 326(a). Right off the bat, the actual stakeholders in this case lose a significant portion of the Sale Proceeds without receiving any substantive benefit.

As in *R & S St. Rose Lenders,* denying conversion to Chapter 11 and retaining the Chapter 7 trustee will increase the burdens on the Creditors who have a financial stake in this proceeding without providing any corresponding benefit.

Nothing in § 706(b) states that a trustee's interest in a larger commission should control whether a case is converted to Chapter 11. 11 U.S.C. § 706(b). While there are many cases which point out that a primary goal of bankruptcy is giving a debtor "fresh start"[8] or effectuating pro rata distribution to creditors[9,] none hold that a trustee's interest in a commission is a goal of the Bankruptcy Code.

---

[8] *In re Wilhelm*, 369 B.R. 882, 883 (Bankr. M.D.N.C. 2007); *In re Bowen*, 2000 WL 708961, at *8 (Bankr. E.D.Pa. May 26, 2000).

[9] See *In re Norton*, 2018 WL 4005432, at *2 (Bankr. D.Mass. Aug. 17, 2018) ("the two primary goals of bankruptcy: to ensure that all creditors are treated equitably and to secure a fresh start for the debtor."); *In re Pace*, 2000 WL 337599, at *6 (Bankr. E.D.Pa. Mar. 24,

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

In this case, the Debtor is a company which will not get a discharge so its "fresh start" is not a factor.

In this case, there is only two creditors--the two movants who hold a joint claim and are the Plan Proponents--so equitable distribution among creditors is not a factor.

As a bankruptcy trustee, the Trustee has a fiduciary duty to the creditors of the bankruptcy estate. See *Hall v. Perry (In re Cochise Coll. Park, Inc.),* 703 F.2d 1339, 1357 (9th Cir. 1983) ("A bankruptcy or reorganization trustee is a fiduciary of each creditor of the estate…"). When the Trustee takes a position which is for her personal benefit and contrary to the interests of the creditors, she appears to be breaching her fiduciary duty.

The Trustee and her counsel will not go without compensation. The Trustee should have approximately $110,000.00 to pay her commission and costs and to pay her counsel and any other administrative expenses.  The Creditors proposed plan provides that upon the Effective Date of the Plan the bankruptcy estate or the Plan Proponents will pay all administrative priority fees and costs incurred in this Chapter 7 bankruptcy case.[10] The Trustee's commission at this time should be based

---

2000), *aff'd,* 2000 WL 1056442 (E.D.Pa. July 28, 2000) ("The primary goals of bankruptcy are equal treatment of creditors and the debtor's fresh start."); *In re Fultz*, 2004 WL 451258, at *2 (Bankr. N.D.Fla. Feb. 13, 2004):
>    While the fresh start afforded to debtors by the discharge is one of
>    the primary goals of bankruptcy, it is not all about the discharge. The other major policy
>    behind bankruptcy is to provide for the efficient and equitable distribution of the debtor's
>    available assets to creditors who would otherwise have to pursue individual collection
>    remedies.

[10] 7.01 The means for implementation of this Plan are:
>        (a)  the funds held by the Trustee;
>        (b)  funds provided by the Plan Proponents to pay any remaining claims of Chapter 7
>             administrative creditors on the Effective Date of the Plan; and

on the $222,000.00 previously collected and turned over to the Trustee by special counsel, John Muije.

The key factual decision that this Court must make is whether conversion will benefit the remaining two creditors of this debtor--the movants. If keeping the case in Chapter 7 will only benefit the Trustee and the Trustee's counsel to the detriment of the Creditors, the case should be converted.

## RELIEF REQUESTED

RUSSEL NYPE and REVENUE PLUS, LLC request that this case be converted to a case under Chapter 11 to allow the Creditors to propose and confirm a plan of reorganization as described in this motion.

RUSSEL NYPE and REVENUE PLUS, LLC further request that a Chapter 11 trustee be appointed to serve in this case until the Plan can be confirmed.

DATED:  September 21, 2022

<div style="margin-left:3em">

SCHWARTZER & IMES LAW FIRM PC

/s/ Lenard E. Schwartzer
Lenard E. Schwartzer, Esq.
2850 South Jones Blvd., Suite 1
Las Vegas, Nevada 89146-5640
*Attorneys for Russell Nype*
*  and Revenue Plus, LLC*

</div>

SCHWARTZER & IMES LAW FIRM PC
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5640
Tel: (702) 228-7590 · Fax: (702) 892-0122

---

(c)  the sale of the Debtor's indirect 40% interest in the Property owned by Wink One (most probably through the sale of the Property to the RTC).

# EXHIBIT 1

Electronically Filed
1/17/2020 1:41 PM
Steven D. Grierson
CLERK OF THE COURT

**FFCL**

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| RUSSELL L. NYPE; REVENUE PLUS, LLC, DOES I through X; DOES I through X; DOE CORPORATIONS CASE NO: A-16-740689-C I through X; and DOES PARTNERSHIPS I through X, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID J. MITCHELL; BARNET LIBERMAN; LAS VEGAS LAND PARTNERS, LLC; MEYER PROPERTY, LTD.; ZOE PROPERTY, LLC; LEAH PROPERTY, LLC; WINK ONE, LLC; LNE WORK, LLC; LNE WORK MANAGER, LLC; AQUARIUS OWNER, LLC; L VLP HOLDINGS, LLC; MITCHELL HOLDINGS, LLC; LIBERMAN HOLDINGS, LLC; 305 LAS VEGAS, LLC; LIVE WORKS TIC SUCCESSOR, LLC; CASINO COOLIDGE LLC; DOES I through ill, and ROE CORPORATIONS I through ill, inclusive, <br><br> Defendants. | Case No.:  A-16-740689-C <br><br> Dept.:  XI |

***AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW***

This matter having come on for non-jury trial before the Honorable Elizabeth Gonzalez beginning on December 30, 2019, and continuing day to day, until its completion on January 7, 2020; John W. Muije of John W. Muije & Associates appeared on behalf of Russell L. Nype and Revenue Plus, LLC ("Plaintiffs") and Shelley D. Krohn, U.S. Bankruptcy Trustee ("Plaintiff Trustee"); H. Stan Johnson, James L. Edwards and Kevin M. Johnson of the law firm of Cohen, Johnson, Parker & Edwards appeared on behalf of David J. Mitchell, Las Vegas Land Partners, LLC, Meyer Property Ltd., Zoe Property LLC, Leah Property LLC, Wink One LLC, LiveWork LLC, LiveWork Manager LLC, Aquarius Owner LLC, LVLP Holdings LLC, Mitchell Holdings

1  LLC, Live Works TIC Successor LLC, FC/Live Work Vegas LLC, ("Mitchell Defendants");[1]

2  Brian W. Boschee of the law firm of Holley Driggs Walch Fine Puzey Stein & Thompson

3  appeared on behalf of Defendant 305 Las Vegas, LLC[2]; and, Eliott S. Blut appeared on behalf of

4  Defendants Barnett Liberman and Casino Coolidge; the Court having read and considered the

5  pleadings filed by the parties; having reviewed the evidence admitted during the trial; having

6  heard and carefully considered the testimony of the witnesses called to testify and weighing their

7  credibility; having considered the oral and written arguments of counsel, and with the intent of

8  rendering a decision on all claims before the Court,[3] pursuant to NRCP 52(a) and 58; the Court

9  makes the following findings of fact and conclusions of law:

10

11                                          **FINDINGS OF FACT**

12

13       1.    This action arises from a judgment that Plaintiffs obtained on or about April 10,

14  2015, against Las Vegas Land Partners, LLC ("LVLP") in Case No. A551073.  Plaintiff filed this

15  suit on July 26, 2016.  The complaint was amended by the filing of an amended complaint on

16  August 21, 2017.

17       2.    Plaintiff Trustee was duly appointed to act as the Trustee in the Bankruptcy Case

18  *of Las Vegas Land Partners, LLC*, Case No. BK-19-15333-mkn and moved to intervene in the

19  instant action, which motion was granted on November 18, 2019. Plaintiff Trustee filed the

20  complaint in intervention on November 18, 2019.

21       3.    Plaintiff Russell L. Nype ("Nype") is an adult resident of New York.

22

23

24  [1]    Given the filing of *Las Vegas Land Partners, LLC*, Case No. BK-19-15333-mkn in
    August 2019, the Court takes no action against Las Vegas Land Partners, LLC.

25  [2]    The Court granted the Rule 50(a) motion by 305 Las Vegas, LLC at the close of the
26  Plaintiffs' case as no damages against that entity were established given the nature of its conduct.

27  [3]    Plaintiff asserted five claims for relief against the Defendants:  1) Constructive Trust;
    2) Fraudulent Transfer; 3) Civil Conspiracy; 4) Declaratory Relief; and 5) Alter Ego.
28

1

4.      Plaintiff Revenue Plus, LLC (collectively with Nype, "Plaintiffs") is a Florida

2

limited liability company.

3

5.      Defendant, David J. Mitchell ("Mitchell"), is an adult resident of New York.

4

6.      Defendant, Barnett Liberman ("Liberman"), is an adult resident of New York.

5

7.      Defendant Mitchell Holdings, LLC ("Mitchell Holdings") is a Delaware limited

6

liability company.

7

8.      Defendant LVLP Holdings, LLC ("LVLP Holdings") is a Delaware limited

8

liability company that was formed on or about November 4, 2004 by Mitchell and Liberman.

9

9.      Defendant Las Vegas Land Partners ("LVLP") is a Delaware limited liability

10

company.

11

10.      Mitchell and Liberman are managers of LVLP.

12

11.      At all relevant times, Mitchell and Liberman were the sole owners (50/50) and

13

managers of LVLP Holdings.

14

12.      At all relevant times, LVLP was owned (50/50) and managed by Mitchell and

15

Liberman.

16

13.      Defendant Casino Coolidge LLC is a Nevada limited liability company. ("Casino

17

Coolidge").

18

14.      Liberman is the managing member of Casino Coolidge.

19

15.      Defendant Aquarius Owner, LLC ("Aquarius") is a Delaware limited liability

20

company.

21

16.      Defendant Leah Property, LLC ("Leah") is a Delaware limited liability company.

22

17.      Defendant Livework, LLC ("Livework") is a Delaware limited liability company.

23

18.      Defendant Livework Manager, LLC ("Livework Manager"), is a Delaware limited

24

liability company.

25

19.      Defendant Zoe Property, LLC ("Zoe") is a Delaware limited liability company.

26

20.      Defendant Wink One, LLC ("Wink") is a Delaware limited liability company.

27

28

3

1

2

21.    Defendant Meyer Property, LLC ("Meyer") is a Delaware limited liability company.

3

4

22.    Non-party Charleston Casino Partners, LLC ("Casino Partners") is a Delaware limited liability company.

5

6

23.    Defendant FC/LW Vegas, LLC ("FC/LW") is a Delaware limited liability company.

7

8

24.    Defendant LiveWorks TIC Successor, LLC ("TIC Successor") is a Delaware limited liability company.

9

25.    These entities are collectively referred to as the Related Entities.[4]

10

11

12

26.    305 Las Vegas, LLC ("305 Las Vegas") was created in April of 2007 for the purpose through a 1031 exchange of purchasing real property located around 300 East Charleston.

13

14

27.    In 2005, Mitchell and Liberman requested Nype's assistance with finding a development partner to assist them in developing certain real property in Downtown Las Vegas.

15

16

17

28.    Prior to closing the transaction with Forest City, a dispute arose between LVLP and Nype in late 2006/early 2007 over the amount Nype was entitled to be paid related to the transaction with Forest City.

18

19

29.    Mitchell and Liberman were fully aware that Nype was expecting to receive at least two million dollars for his efforts.

20

21

30.    Despite understanding Nype's expectations, Mitchell and Liberman only set aside $430,000.

22

23

31.    Shortly after setting aside that amount, Mitchell and Liberman took personal distributions from LVLP in excess of thirteen million dollars.

24

25

26

27

28

[4]    For purposes of the term "Related Entity" the following are included: Las Vegas Land Partners, LLC, Meyer Property Ltd., Zoe Property LLC, Leah Property LLC, Wink One LLC, LiveWork LLC, LiveWork Manager LLC, Aquarius Owner LLC, LVLP Holdings LLC, LiveWorks TIC Successor LLC, FC/LiveWork Vegas LLC and Casino Coolidge LLC.

4

32.    On November 2, 2007, LVLP and two other entities[5] sued Nype seeking primarily a declaratory judgment that they did not owe Nype any fee, Nype counterclaimed seeking compensation for services rendered.

33.    In December 2014, Leah sold certain real property to Casino Coolidge for $1,000,000.  Mitchell and Liberman caused Leah to distribute sales proceeds in the amount of $341,934.47 directly to themselves, rather than Leah's parent company, LVLP.  Plaintiff has not established that given the market conditions at the time that Mitchell and Liberman sold the Leah Property without obtaining reasonably equivalent value in exchange.

34.    After obtaining judgment on the counterclaim in 2015, Nype engaged in significant attempts to collect on the Judgment from LVLP.

35.    Those efforts resulted in recovery of approximately $10,000.

36.    Between 2007 and 2016, Mitchell and Liberman distributed to themselves a total of $15,148,339 from the Related Entities.

37.    These distributions were at times that Mitchell and Liberman were fully aware of Nype's claims.

38.    The distributions caused and/or contributed to the Related Entities' insolvency and/or inability to pay their debts as they became due.

39.    The evidence also demonstrates that Mitchell, Liberman and the Related Entities engaged in conscious, concerted and ongoing efforts to conceal, hide, convey, keep secret and/or divert millions of dollars in assets away from Nype and/or other creditors.

40.    The evidence also demonstrates that Mitchell, Liberman and the Related Entities engaged in conscious, concerted and ongoing efforts to ensure that funds and/or assets that would otherwise be available to Nype to satisfy his claims (and Judgment) were kept away from Nype.

---

[5]    The other plaintiffs in that case were LiveWork LLC and Zoe Properties, LLC, neither of which were named as counterdefendants.

41.    The evidence demonstrates that Mitchell, Liberman and the Related Entities distributed in excess of $15,000,000 in funds that should have been available to satisfy Nype's claims/Judgment.

42.    Nype's disclosure of the tax returns and its own consultant's report[6] on or about April 25, 2014, in A551073, are the latest date of discovery for purposes of NRS 112.230(1)(a).[7]

43.    David Mitchell was not credible.[8]  The failure of Mitchell to meaningfully participate in discovery until the eve of trial and the failure to produce documents which should have been in his possession leads the Court to conclude that if those documents had been produced they would have been adverse to Mitchell.

44.    At all relevant times, each of the Related Entities was wholly owned and managed by LVLP or LVLP Holdings.

45.    At all relevant times, each of the Related Entities was beneficially owned, controlled, and managed by Mitchell and Liberman.

46.    One or more of the Related Entities was formed with an initial capitalization of just $10.

---

[6]    The report is a part of Exhibit 90079.

[7]    That statute provides in pertinent part:

1. A claim for relief with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:

   (a) Under paragraph (a) of subsection 1 of NRS 112.180, within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant;

[8]    The explanation by Mitchell surrounding the creation of retention agreements with the CPA Sam Spitz signed in different styles and ink is additional information which leads the Court to believe Mitchell is not credible.  (Exhibits 60032-60036).

47.    At all relevant times, each of the Related Entities was treated by Mitchell and Liberman as a disregarded entity of LVLP Holdings for tax purposes and all of the Related Entities filed one combined tax return.

48.    Except with respect to Livework Manager and Casino Coolidge, none of these entities had its own bank account. Mitchell caused each of the Related Entities to use the same bank accounts to deposit and disburse funds, including distributions to Mitchell and Liberman.

49.    At all relevant times, Mitchell and Liberman caused each of the Related Entities to use the same financial and accounting records, which are not distinguishable by entity. Each of the Related Entities' financial and accounting records are not distinguishable by entity.

50.    The LVLP accounting records include a few Mitchell and Liberman personal transactions and postings commingled from multiple entities.

51.    Mitchell and Liberman caused each of the Related Entities to use the same general ledger to post all entries under the name of "Las Vegas Land Partners".

52.    Mitchell, Liberman and the Related Entities commingled funds, including personal loans from various banks which are included in the LVLP accounting records and general ledger.

53.    Mitchell and Liberman also used journal entries to post commingled transactions for themselves and the Related Entities.

54.    In 2016, the Related Entities stopped using bank accounts and instead began using journal entries to post entries apparently transacted personally by Mitchell.

55.    As a result of Mitchell and Liberman's domination, influence and control over the Related Entities, the individuality and separateness of the Related Entities—vis-à-vis themselves and Mitchell and Liberman—was and remains nonexistent as evidenced by the commingling of funds, transactions, revenues, expenses, assets, liabilities and contributed capital.

56.    The manner in which Mitchell and Liberman operated the Related Entities makes it virtually impossible to identify transactions by purpose and/or entity.

57.    The evidence demonstrates that: (a) Mitchell, Liberman and the Related Entities commingled funds, transactions and assets; (b) the Related Entities were and are undercapitalized;

(c) Mitchell, Liberman and the Related Entities distributed funds to Mitchell and Liberman as individuals without regard to parent entities; (d) Mitchell, Liberman and the Related Entities treated assets of the other entities as their own; and (e) the Related Entities failed to observe corporate or LLC formalities.

58.    The evidence demonstrates that the Related Entities: (a) are and were influenced and governed by Mitchell and Liberman; (b) there is such unity of interest and/or ownership that Mitchell, Liberman and the Related Entities are inseparable from the other; and (c) the facts are such that adherence to the fiction of separate entities would, under the circumstances, sanction a fraud or promote injustice.

59.    Mitchell, Liberman and the Related Entities have made distributions to avoid satisfying Nype's claims and Judgment.

a.    When Leah Property sold certain real property to Casino Coolidge on or about December 17, 2014, and did not transfer the funds to LVLP;

b.    When Mitchell and Liberman took personal distributions from the Related Entities, between 2007 and 2016, totaling $15,148,339.

60.    In determining that these distributions were made with the actual intent to hinder, delay or defraud creditors and Nype, the Court notes, among other things, the following:

a.    They were made to "insiders" or other entities of which Mitchell and Liberman own or control (in whole or in part);

b.    They were made at times when Mitchell and Liberman were fully aware of Nype's claims, Judgment and/or Nype's intent to sue for the amounts owed to him.

c.    The distributions rendered or contributed to LVLP's and/or the Related Entities' insolvency, and left LVLP and/or the Related Entities unable to pay their debts as they became due;

d.  Mitchell, Liberman and the Related Entities attempted to conceal the distributions and their assets, through their discovery misconduct in this matter, which required enormous and expensive effort on Nype's part to <u>attempt</u> to obtain full and proper disclosure; and

e.  Mitchell, Liberman and the Related Entities removed or concealed assets.

61.  If any findings of fact are properly conclusions of law, they shall be treated as if appropriately identified and designated.

## CONCLUSIONS OF LAW

1.  In Nevada, there are three general requirements for application of the alter ego doctrine: (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice." *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 601, 747 P.2d 884, 886 (1987).

2.  Nevada recognizes application of the alter ego doctrine in reverse, in which a creditor is permitted to reach "the assets of a corporation to satisfy the debt of a corporate insider based on a showing that the corporate entity is really the alter ego of the individual." <u>Loomis</u>, 116 Nev. at 903, 8 P.3d at 846.

3.  Application of the alter ego doctrine in reverse "is appropriate where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted." <u>Id.</u>, at 904, 8 P.3d at 846.

4.  The Court, concludes that: (a) Mitchell, Liberman and the Related Entities commingled funds, transactions and assets; (b) the Related Entities were and are undercapitalized; (c) Mitchell, Liberman and the Related Entities committed unauthorized diversion of funds; (d)

Mitchell, Liberman and the Related Entities treated assets of the other entities as their own; and

(e) the Related Entities failed to observe corporate and LLC formalities.

5.    The Court further concludes the evidence demonstrates that the Related Entities: (a) are and were influenced and governed by Mitchell and Liberman; (b) there is such unity of interest and/or ownership that Mitchell, Liberman and the Related Entities are inseparable from the other; and (c) the facts are such that adherence to the fiction of separate entities would, under the circumstances, sanction a fraud or promote injustice.

6.    Justice and equity require that the Court impose alter ego liability on Mitchell, Liberman and the Related Entities.

7.    Nype has proven, by a preponderance of the evidence his claim for alter ego, establishing that Mitchell, Liberman, and each of the Related Entities, is the alter ego of LVLP and each other.

8.    Nype has not proven, by a preponderance of the evidence, his claim for alter ego that Mitchell Holdings is the alter ego of Mitchell.

9.    Mitchell, Liberman and each of the Related Entities are jointly and severally liable on Nype's Judgment and the damages, attorney's fees and costs awarded in this action.

10.    Prior to September of 2015, Nype had reason to know that the limited transfers were transfers made by debtors under the UFTA, that the transfers rendered debtors insolvent (or contributed thereto) or the facts and circumstances upon which this Court utilized in determining that the transfers were made with the actual intent to hinder, delay or defraud creditors (including Nype).

11.     Nype has proven, by a preponderance of the evidence his claims for fraudulent transfer, including that certain of the distributions constitute fraudulent transfers within the meaning of NRS 112.180(1)(a). [9]

12.     Certain of those distributions were made outside the limitations period under NRS 112.230(1).

13.     Nevada's Uniform Fraudulent Transfer Act provides an equitable remedy for creditors affected by a fraudulent transfer, but nothing more. *Cadle Co. v. Woods & Erickson, LLP*, 131 Nev. Adv. Op. 15, 345 P.3d 1049 (2015).

14.     Nype has proven by a preponderance of the evidence that he suffered damages in the amount of $341,934.47 as a result of the fraudulent transfer of the proceeds of the Leah transaction with Casino Coolidge directly to Liberman and Mitchell, rather than to Leah's parent LVLP.

15.     The earlier transfers are barred by the limitations period for purposes of the fraudulent transfer claim, only.

16.     Nype has proven by a preponderance of the evidence that he suffered special damages in the form of attorney's fees, costs and expert expenses related to the transfers in the total amount of $4,493,176.90.[10]

17.     Plaintiff cannot recover on a civil conspiracy claim (or accessory liability) for allegations arising out of NRS Chapter 112 against a nontransferor. *Cadle Co. v. Woods & Erickson, LLP*, 131 Nev. 114 at 120, 345 P.3d 1049 (2015).

---

[9]     The Court is cognizant of the possibility of duplicative awards given the various claims for relief.

[10]     The Court has previously evaluated the *Brunzell* factors in connection with the sanctions order which has now been satisfied. See 12/26/19 filing. That evaluation is incorporated by reference.

11

18.    Independent of NRS Chapter 112, to prove a civil conspiracy, Plaintiff must prove "a combination of two or more persons who, by some concerted action, intend to accomplish a lawful objective for the purpose of harming another, and damage results from the act or acts." *Hilton Hotels vs. Butch Lewis Productions*, 109 Nev. 1043, 148, 862 P.2d 1207, 1210 (1993).

19.    The Court concludes that the evidence demonstrates that:

a.    Mitchell and Liberman, engaged in conscious, concerted and ongoing efforts to conceal, hide, convey, keep secret and/or distribute millions of dollars in assets away from Nype;

b.    Mitchell and Liberman received distributions from LVLP and the Related entities;

c.    Mitchell, fabricated and backdated evidence to facilitate the destruction and/or concealment of material financial evidence by his agent that would have greatly assisted Nype's case.

d.    But for Nype's pretrial discovery,[11] the fabrication of evidence would not have been uncovered.

20.    Nype has proven his claim of civil conspiracy, by a preponderance of the evidence against Mitchell and Liberman.

21.    Plaintiff has not established by a preponderance of the evidence the elements of civil conspiracy separate and apart from the distributions and fabrication of evidence.

22.    Plaintiff has established damages on the civil conspiracy claim in the amount of $15,148.339.

23.    Nype has not demonstrated that punitive damages are appropriate in this matter.

---

[11]    The limitations for a civil conspiracy claim is not limited by NRS 112.230(1)(a) but is instead governed by NRS 11.220 and the discovery rule. *Siragusa v. Brown*, 114 Nev. 1384 at 1391-3 (1998).

12

24.     Nype is entitled to recover his attorney's fees as special damages as he was successful on his claim for civil conspiracy in the total amount of $4,493,176.90.

25.     Nype has not established a claim for constructive trust given the current state of title of the remaining parcels in which the Related Entities hold their interest.

26.     Mitchell, Liberman, and the Related Entities' actions and inactions have caused Nype damages in the total amount of $19,641,515.90.[12]

27.     Nype may also file a post-trial motion if appropriate, for fees and costs not proven during the trial as special damages.

28.     Given the findings and conclusion no further relief on the Declaratory Relief claim is appropriate.

29.     If any conclusions of law are properly findings of fact, they shall be treated as if appropriately identified and designated.

Based upon the foregoing Findings of Fact and Conclusions of Law:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that JUDGMENT is hereby entered in favor of Plaintiffs and jointly and severally against Mitchell, Liberman, Meyer Property Ltd., Zoe Property LLC, Leah Property LLC, Wink One LLC, LiveWork LLC, LiveWork Manager LLC, Aquarius Owner LLC, LVLP Holdings LLC, LiveWorks TIC Successor LLC, FC/LiveWork Vegas LLC and Casino Coolidge LLC on the fraudulent conveyance claim in the amount of $4,835,111.37.[13]

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that JUDGMENT is hereby entered in favor of Plaintiffs and jointly and severally against Mitchell and Liberman on

---

[12]     This is the total amount of damages which is not duplicated among the various claims for which the Court has made an award.

[13]     These damages are duplicated in the civil conspiracy judgment.

1  the civil conspiracy claim in the amount of $19,641,515.90.

2         **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that JUDGMENT is

3  hereby entered in favor of Plaintiffs and jointly and severally against Mitchell, Liberman, Meyer

4  Property Ltd., Zoe Property LLC, Leah Property LLC, Wink One LLC, LiveWork LLC,

5  LiveWork Manager LLC, Aquarius Owner LLC, LVLP Holdings LLC, LiveWorks TIC

6  Successor LLC, FC/LiveWork Vegas LLC and Casino Coolidge LLC on the alter ego claim in

7  the amount of the underlying judgment in A551073.

8   

9                    DATED this 17th day of January, 2020.

10

11

12                              Elizabeth Gonzalez, District Court Judge

13

14                        **Certificate of Service**

15         I hereby certify that on the date filed, a copy of the foregoing Findings of Fact and Conclusions of

16  Law was electronically served, pursuant to N.E.F.C.R. Rule 9, to all registered parties in the Eighth

Judicial District Court Electronic Filing Program.

17            *If indicated below*, a copy of the foregoing Scheduling Order was also:

18        ☐  Placed in the Attorney(s) Folder on the 1st Floor of the RJC for;

19

20        ☐  Mailed by United States Postal Service, Postage prepaid, to the proper parties listed below at

their last known address(es):

21

22

23                        Dan Kutinac

24

25

26

27

28