**EXHIBIT "2"**

**PURCHASE AND SALE AGREEMENT WITH ESCROW INSTRUCTIONS**

This Purchase and Sale Agreement with Escrow Instructions ("Agreement") is entered into effective as of [_____], 2024 (the "Effective Date"), by and between SHELLEY D. KROHN (the "Trustee"), the Chapter 7 Trustee for the bankruptcy estate of Las Vegas Land Partners, LLC which is the 100% member of WINK ONE LLC, a Delaware limited liability company ("Wink One"); FC RTC 39, LLC, a Delaware limited liability company ("FC RTC 39"); and FC RTC 20, LLC, a Delaware limited liability company ("FC RTC 20") (collectively, "Seller"), and REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA ("Buyer"). Buyer and Seller may each occasionally be referred to herein as a "Party" and together as the "Parties."

## RECITALS

WHEREAS, Seller owns the real property described on **Exhibit A** attached hereto consisting of approximately 2.75 acres of land, together with the buildings, structures, fixtures, and improvements located thereon, all rights, benefits, privileges, easements, tenements, hereditaments, reversions, remainders, rights-of-way and other appurtenances thereon or in any way appertaining thereto, (collectively, the "Real Property");

WHEREAS, Seller (as Landlord) is currently leasing the Real Property to Buyer (as Tenant) under that certain Agreement of Lease dated April 2, 2007, as amended by that certain First Amendment to Lease dated September 17, 2007, as may be further amended (collectively, "Lease Agreement");

WHEREAS, on August 19, 2019, a party with an ownership interest in the Property (as defined below) filed a voluntary chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") (Case Number BK-S-19-15333-MKN; the "Bankruptcy Case"). Las Vegas Land Partners, LLC (the "Debtor"), the entity that filed the Bankruptcy Case, owns 100% of Wink One, that in turn, owns a 40% tenant-in-common interest in the Real Property. FC RTC 39 and FC RTC 20 collectively hold the remaining 60% tenant-in-common interest in the Real Property.

WHEREAS, the Trustee is the duly appointed Chapter 7 Trustee of the bankruptcy estate of the Debtor and is empowered to administer the assets of the Debtor, which includes the Debtor's interest in Wink One, which owns the 40% interest in the Real Property. The Trustee desires to sell the Real Property and has received approval from FC RTC 39 and FC RTC 20 to sell its interest in the Real Property in addition to Debtor's interest in the Real Property.

WHEREAS, Seller is the borrower/trustor under a deed of trust recorded April 29, 2008 in Book 20080429 as Instrument No. 05697 of Clark County Official Records ("Existing Loan"), Title Company (as defined below) is the trustee of the Existing Loan and Bank of New York (successor-in-interest to CTL Lending Group LLC, a Delaware limited liability company pursuant to an Assignment of Deed of Trust, Assignment of Leases and Rents and Loan Documents recorded April 29, 2008 (together with its successors and assigns) ("Lender") is the Lender of the Existing Loan;

WHEREAS, Trustee and Seller desires to sell to Buyer and Buyer desires to purchase from Seller with all necessary approvals of Trustee and Lender, the Real Property and all of Seller's interest in and to all tangible and intangible personal property, if any, owned by Seller related to the Real Property and improvements thereon, including without limitation, permits, surveys (the "Personal Property" and together with the Real Property, the "Property") upon the terms and covenants and subject to the conditions set forth below;

WHEREAS, the Parties desire to terminate the Lease Agreement and remove any items of record from the Property reference the Lease Agreement with the approval of Lender and Trustee, as part Buyer's Closing Condition (as defined herein);

WHEREAS, the Seller desires to assign the Existing Loan to Buyer (and customary ancillary loan documents) with the approval of Lender and Trustee, as part of Buyer's condition to Closing (as defined herein);

NOW, THEREFORE, in consideration of the mutual covenants contained herein, it is agreed as follows:

## AGREEMENT

1.      **Purchase and Sale**.  Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, the Property, in accordance with the terms and conditions set forth in this Agreement.

2.      **Purchase Price; Deposit**.

(a)      The purchase price of the Property is Twenty Million Dollars ($20,000,000.00) ("Purchase Price") and the assumption, or payoff, of the Existing Loan, subject to any other applicable prorations and adjustments as provided in this Agreement.  The Purchase Price shall be divided amongst the Seller as follows: (a) FC RTC 39 and FC RTC 29 shall receive $9,200,000.00 for the purchase of their tenant-in-common interest in the Property; and (b) the Trustee shall receive $10,800,000.00 for the purchase of Wink One's tenant-in-common interest in the Property.

(b)      Within ten (10) business days after the Effective Date, Buyer shall deposit earnest money in the sum of Fifty Thousand Dollars ($50,000.00 (the "Deposit") with First American Title Insurance Company (Escrow Officer: Trent Thomas and Anastasia Dion at (702) 266-8983; 8311 W Sunset Road, Suite 100 Las Vegas, NV 89113) (the "Title Company").  The Deposit shall be non-refundable to Buyer, except in the event of a Seller default or as otherwise expressly provided in this Agreement. The Deposit shall be applied to the Purchase Price at Closing.

3.      **Escrow**.  Within three (3) business days after the Effective Date, the Parties shall deliver an executed copy of this Agreement to Title Company, and this Agreement shall, thereupon, constitute escrow instructions; provided however, that Title Company's failure to execute the acknowledgement attached hereto shall not affect the validity of this Agreement.

4.      **Seller Deliveries**.  On or before five (5) calendar days after the Effective Date, Seller shall make available to Buyer the following documents, if any, related to the Property to the extent they are in Seller's possession: existing title policies or commitments; surveys; all

governmental and quasi-governmental permits, notices, reports, citations; and inspection reports (collectively, the "Seller Deliveries").

5.    **Title and Survey Review Period**.

(a)    On or before ten (10) calendar days after the Effective Date, Seller shall obtain, at Buyer's expense, a current commitment for owner's ALTA title insurance policy issued by the Title Company, including legible copies of all recorded exceptions to title referred to therein ("Title Commitment"), showing marketable, fee simple title to the Property to be vested in Seller and committing to insure such title to the Property in Buyer (or its assignee) in an amount equal to the Purchase Price by the issuance of a 2006 ALTA form of extended coverage policy of owner's title insurance, with the standard printed exceptions deleted. On or before the Closing Date, the Title Company shall cause to be delivered to Buyer concurrently with a then current Title Commitment a current tax certificate for the Property showing the Property as a separately assessed parcel.

(b)    Buyer, at its sole cost and expense, may obtain a survey of the Property (the "Survey"), completed by a state-licensed surveyor.

(c)    Buyer shall have the right to object, in Buyer's sole and absolute discretion, to any matter appearing on or related to the Title Commitment or Survey (each, a "Title Objection") by delivering written notice of such Title Objection ("Title Objection Notice") to Seller on or before the date that is twenty (20) days after the Effective Date. If Buyer delivers the Title Objection Notice, then, no later than five (5) calendar days after the receipt of the Title Objection Notice (the "Title Response Deadline"), Seller may deliver, in Seller's sole and absolute discretion, a response stating therein whether and how Seller agrees to cure the Title Objections in the Title Objection Notice on or before Closing (the "Seller Title Response"). If Seller fails to deliver the Seller Title Response on or before the Title Response Deadline, Seller shall be deemed to have elected not to cure any of the Title Objections set forth in the Title Objection Notice. If Seller fails to deliver the Seller Title Response on or before the Title Response Deadline or does not agree in the Seller Title Response to cure all Title Objections to Buyer's satisfaction, in Buyer's sole and absolute discretion, then Buyer shall have the right, by written notice to Seller delivered on or before the date that is five (5) calendar days after the Title Response Deadline, to either, in Buyer's sole and absolute discretion: (i) terminate this Agreement, in which event this Agreement shall be of no further force and effect, and all Parties hereto shall thereupon be relieved and absolved of any further liabilities or obligations whatsoever to each other hereunder, except with respect to those liabilities or obligations hereunder which are expressly stated to survive the termination of this Agreement, or (ii) waive such uncured Title Objections, in which event such Title Objections shall be deemed Permitted Exceptions and the parties shall proceed towards Closing in accordance with and subject to this Agreement (the "Notice to Proceed"). If Buyer does not timely deliver such written notice to Seller, Buyer shall be deemed to have elected to terminate this Agreement pursuant to clause (i) above. If Seller agrees, or agrees with conditions, in the Seller Title Response to cure all Title Objections, then the Notice to Proceed shall automatically be deemed delivered and effective upon Buyer's receipt of such Seller Title Response.

(d)    The exceptions to title disclosed in the Title Commitment, other than (a) those Title Objections which are not subsequently cured or waived, (b) any delinquent taxes or assessments, (c) any standard printed exceptions, and (d) the statutory exceptions, shall be the "Permitted Exceptions" hereunder. Notwithstanding anything to the contrary contained herein,

-3-

Seller shall discharge and remove any and all liens affecting the Property which secure an obligation to pay money (other than installments of real and personal property taxes and liens for special improvements not delinquent as of the Closing) ("Monetary Liens"), and such Monetary Liens shall not be Permitted Exceptions (whether or not Buyer expressly objects to such Monetary Liens).

6.    **Due Diligence Period**.

(a)    From the Effective Date through the date that is twenty (20) calendar days after the Effective Date (the "Due Diligence Period"), Buyer, its employees, agents, consultants, and representatives may enter upon the Property to conduct inspections of the Property and to investigate and evaluate the Property, to review all Seller Deliveries, and to investigate any other aspects or characteristics of the Property, at Buyer's sole cost and expense, including but not limited to environmental, legal, financial, commercial, geologic, soils, engineering, regulatory, title, permitting, and other due diligence and noninvasive testing of the Property (collectively, "Inspections"). Seller agrees to cooperate reasonably with any such Inspections made by or at Buyer's direction.

(b)    Subject to the terms and conditions of Section 5, above, if Buyer is not satisfied with the Property for any reason or no reason whatsoever, in Buyer's sole and absolute discretion, then Buyer shall have the right to terminate this Agreement by written notice to Seller delivered on or before the expiration of the Due Diligence Period, in which event this Agreement shall be of no further force and effect, and (i) all Parties hereto shall thereupon be relieved and absolved of any further liabilities or obligations whatsoever to each other hereunder, except with respect to those liabilities or obligations hereunder which are expressly stated to survive the termination of this Agreement, and (ii) the Deposit shall be returned to Buyer.

7.    **Intentionally Deleted**.

8.    **Buyer's Conditions to Closing**.  Buyer's obligation to close under the Agreement shall be subject to and conditioned upon the fulfillment of each and all of the following conditions precedent (collectively, "Buyer's Closing Conditions"):

(a)    Title Policy.   The Title Company shall be prepared and irrevocably committed in writing to issue to Buyer an owner's extended coverage title insurance policy on a standard American Land Title Association form (the "Title Policy") with the standard pre-printed exceptions deleted, insuring good, marketable, insurable title to the Property in Buyer (or its assignee), subject only to the Permitted Exceptions and with all endorsements requested by Buyer or agreed to by Seller in satisfaction of Buyer's Title Objections and New Title Objections.

(i)    It shall be a Buyer's Closing Condition that the Title Company shall have removed the below exception from title ("Judgment Exception") and any other items relating to and of record in connection to both (i) the Judgment Exception and (ii) the Bankruptcy Case, which such exception(s) and any other exception(s) shall not be included as an exception in the Title Policy:

A certified copy of a judgment or an abstract thereof, recorded January 16, 2020 in Book 20200116 as Instrument No. 03268 of Official Records.
Court: District Court, Clark County, Nevada
Case No.: A-16-740689-C

Debtor: Wink One, LLC et al.,
Creditor: Russel L. Nype; Revenue Plus, LLC, et. al.,
Amount: $19,641,515.90, and any other amounts due thereunder.

• A document entitled "Affidavit in Support of Recordation of Findings of Fact and Conclusions of Law" recorded January 21, 2020 in Book 20200121 as Instrument No. 03287 of Official Records.

(b)    Monetary Liens. Seller, at Seller's sole cost and expense, shall have caused to be released or removed, on or before the Closing, all Monetary Liens.

(c)    RTC Board Approval. The Parties acknowledge and agree that Buyer's obligations to perform under this Agreement are contingent upon approval of this Agreement by the RTC Board of Directors ("Board") at a future Board meeting. Once the Board has approved this Agreement by its written resolution ("Approval Date"), Buyer shall provide notice to Seller. In the event Buyer does not or elects not to obtain Board approval by December 31, 2024, Buyer shall have the right to terminate this Agreement at any time and this Agreement will be null and void as of that date and of no force and effect.

(d)    Termination of Existing Lease Agreement. On or before the Closing Date, Seller (i) shall terminate the Lease Agreement (with approval from Lender) and executing the Termination of Lease attached hereto as **Exhibit D**, such termination to be effective on or before the Closing Date, and (ii) shall terminate and release of record the Assignment of Leases and Rents document recorded April 29, 2008. Seller agrees to indemnify, defend, and hold harmless Buyer from any claims, damages, losses, and liability arising out of or related to Seller's failure to timely perform the foregoing obligations, or arising out of or relating to any Leases, which obligations to indemnify, defend, and hold harmless shall survive Closing.

(e)    Assignment and Assumption of Loan. Lender providing and/or consenting to (i) the assignment and assumption by Buyer and Seller of Seller's Existing Loan (e.g. Deed of Trust/Note) to Buyer under materially the same or similar terms of the Existing Loan; (ii) Lender estoppel stating there is no existing default under the Existing Loan, that the assignment of the Existing Loan and sale of the Property to Buyer under this Agreement will not constitute a default under the Existing Loan; and (iii) all other Lender consents necessary to effectuate the purchase and sale of the Property between Buyer and Seller.

(f)    Loan Payoff. At Buyer's sole and absolute election, Buyer shall have the right to elect to pay off the Existing Loan in lieu of the assignment and assumption of the Existing Loan set forth in Section 8(e) above. In the event Buyer elects to pay off the Existing Loan, it shall be a Buyer's Closing Condition for (i) Seller and Lender to execute the documents needed in order for the Existing Loan to be fully extinguished and (ii) for the Existing Loan to be removed from the Title Policy to Buyer's sole satisfaction.

(g)    Bankruptcy Court Approval; Approval by Creditors and Interested Parties. This Agreement is contingent upon the Trustee obtaining approval from the Bankruptcy Court to sell the bankruptcy estate's interest in the Property to Buyer pursuant to 11 U.S.C. § 363. Trustee shall secure the consent and approval of all interested creditors and parties in the bankruptcy case consenting to this Agreement in the form of a settlement agreement that (i) waives all rights and claims to the Property; (ii) waives all rights to object to the sale of the Property to the Buyer

pursuant to this Agreement; and (iii) approves the purchase and sale of the Property pursuant to the terms of this Agreement.

(h)     Trustee and Lender Approval. All Trustee and Lender approvals required by Buyer to effectuate this Agreement and to fully satisfy Buyer's Closing Conditions shall have been given.

(i)     Accuracy of Seller's Representations.    Seller's representations and warranties in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, and Seller will so certify in writing.

(j)     Seller's Performance.   Seller shall have timely performed all covenants and obligations and timely complied with all conditions required by this Agreement to be performed or complied with by Seller on or before the Closing Date, including without limitation timely delivery of all of Seller's Closing Deliveries to the Title Company.

(k)     No Litigation.   There shall not be pending any litigation, or actual notice of threatened litigation, which, if determined adversely, would restrain the consummation of any of the transactions contemplated by this Agreement or declare illegal, invalid, or nonbinding any of the covenants or obligations of the Seller or adversely affect the Property or Buyer's ability to use, occupy, develop, redevelop, or renovate the Property for Buyer's intended uses.

(l)     No Violations.   There shall be no written notice issued of any violation or written notice of any alleged violation of any law with respect to any portion of the Property which has not been corrected to the satisfaction of the issuer of the notice.

(m)     No Parties in Possession.   There shall be no parties in possession of the Property other than Buyer.

If any of Buyer's Closing Conditions are not met, Buyer may either, in Buyer's sole and absolute discretion, by written notice to Seller: (i) waive the applicable Buyer's Closing Condition and proceed to Closing on the Closing Date, (ii) extend the Closing Date to allow Seller a sufficient time within which to cure or satisfy such Buyer's Closing Condition, or (iii) terminate this Agreement and receive a return of the Deposit.

9.     **Seller's Conditions to Closing**.  Seller's obligation to close under the Agreement shall be subject to and conditioned upon the fulfillment of each and all of the following conditions precedent (collectively, "Seller's Closing Conditions"):

(a)     Bankruptcy Court Approval.   This Agreement is contingent upon the Trustee obtaining approval from the Bankruptcy Court to sell the bankruptcy estate's interest in the Property to Buyer pursuant to 11 U.S.C. § 363.  The Trustee shall use her best efforts to obtain Bankruptcy Court approval of the sale of the bankruptcy estate's interest in the Property and shall request to have the Bankruptcy Court consider a motion to sell on shortened time.

10.     **Closing; Deliveries.**

(a)     The closing of the transaction contemplated by this Agreement (the "Closing") shall occur five (5) business days following the satisfaction of all of Buyer's Closing

Conditions and Seller's Closing Conditions, at a time and place agreed to between Buyer and Seller (the "Closing Date"). Buyer and Seller may agree in writing upon an earlier Closing Date.

(b)     On or before 11:00 AM Pacific Time on the Closing Date, Seller, at Seller's sole cost and expense, shall deliver to Title Company the following, each dated as of the Closing Date (collectively, the "Seller Closing Deliveries"):

(i)     Original fully executed and acknowledged grant, bargain and sale deed conveying title to the Real Property to Buyer, using the form of deed attached hereto as **Exhibit B** (the "Deed"), subject only to the Permitted Exceptions applicable to the respective portion of Real Property being conveyed in the Deed.

(ii)     Two duly executed original counterparts of a bill of sale and general assignment, in the form attached hereto as **Exhibit C** (the "Bill of Sale"), conveying good and marketable title to all Personal Property to Buyer, free and clear of all liens.

(iii)     Two duly executed original counterparts of the Assignment and Assumption of the Loan Agreement (if applicable).

(iv)     Two duly executed original counterparts of the Termination of Lease Agreement.

(v)     Two duly executed original counterparts (from Lender) of the release and termination of the Assignment of Leases and Rents.

(vi)     Such proof of authority and authorization to enter into this Agreement and the transactions contemplated hereby, and such proof of the power and authority of the individual(s) executing or delivering any documents or certificates on behalf of Seller as may be reasonably required by Title Company.

(vii)     An original duly executed Non-Foreign Affidavit in a form reasonably satisfactory to Buyer and the Title Company. Seller also shall execute and deliver to Buyer and the Title Company a duly executed affirmation reasonably satisfactory to the Title Company and Buyer for the purposes of satisfying the Title Company and Buyer that the transaction is exempt from the withholding requirements under state and local law.

(viii)     Such agreements or statements as may be reasonably required by the Title Company in order to issue the Title Policy, complete the transaction herein provided, and to carry out the intent and purposes of this Agreement, including as may be required by the Title Company in order to issue a gap endorsement and delete all standard exceptions to the Title Policy, including, without limitation, the exceptions related to the parties in possession and mechanic's lien.

(ix)     An executed settlement statement of all prorations, allocations, closing costs and payments of moneys related to the Closing of the transactions contemplated by this Agreement.

(x)     Possession of the Property.

(c)     At Closing, Buyer, at Buyer's sole cost and expense, shall deliver to Title Company (as applicable) the following ("Buyer's Closing Deliveries"):

(i)     The balance of the Purchase Price by wire transfer of funds to the Title Company, credited for the Deposit, and credited and debited with applicable closing costs, adjustments, and prorations as provided in this Agreement.

(ii)     Two duly executed original counterparts of the Bill of Sale.

(iii)     Two duly executed original counterparts of the Assignment and Assumption of the Loan Agreement (if applicable).

(iv)     Two duly executed original counterparts of the Termination of Lease Agreement.

(v)     Such proof of authority and authorization to enter into this Agreement and the transactions contemplated hereby, and such proof of the power and authority of the individual(s) executing or delivering any documents or certificates on behalf of Buyer as may be reasonably required by Title Company.

(vi)     An executed settlement statement of all prorations, allocations, closing costs and payments of moneys related to the Closing of the transactions contemplated by this Agreement.

(vii)     Such other instruments and documents as may be reasonably requested by the Title Company in order to complete the transaction herein provided and to carry out the intent and purposes of this Agreement.

11.     **Closing Costs**.  At Closing, Seller shall pay the following costs: (i) recording fees for the release of all Monetary Liens, if any; and (ii) 50% of all closing costs and escrow fees of the Title Company. Buyer shall pay for the following (i) the title insurance premium for the Title Policy and the associated costs; (ii) any documentary, transfer, stamp, sales, use, gross receipts or similar taxes related to the transfer of the Property; (iii) recording of the Deeds; (iv) 50% of all closing costs and escrow fees of the Title Company; and (v) the costs of all other endorsements to the Title Policy requested by Buyer. Any closing costs not specifically provided for herein shall be paid as is customary in a real property closing in Clark County, Nevada.

12.     **Prorations**.   The real property taxes for the Property as shown on the Title Commitment for the period July 1, 2023 – June 30, 2024 has already been paid. There shall be no real property tax prorations as part of Closing.  In the event there is an outstanding balance for real property taxes due and not yet paid, Seller shall pay when due all real property taxes for the Property imposed for the period up to and including the Closing Date.  Any proration completed at Closing shall be a final settlement, and shall not be subject to readjustment after Closing. Seller shall pay at Closing all special assessments, if any, which are a lien at the time of the Closing.  All prorations shall be final as of the Closing Date.

13.     **Disbursements and Other Actions by Title Company**.  On the Closing Date, Title Company shall promptly undertake all of the following in the manner indicated below:

(a)    <u>Funds</u>.  Disburse all funds deposited with Title Company by Buyer in payment of the Purchase Price, as follows:

(i)    Deduct all items chargeable to the account of Seller pursuant to this Agreement.

(ii)    If, as the result of the prorations and credits required pursuant to this Agreement, amounts are to be charged to account of Seller, deduct the total amount of such charges.

(iii)    Disburse the remaining balance of the Purchase Price to Seller promptly upon Closing.

(b)    <u>Recording</u>.  Record the Deed, Assignment and Assumption of the Loan Agreement (if applicable), the Release of the Assignment of Leases and Rents any other documents which the Parties hereto may mutually direct to be recorded and obtain conformed copies thereof for distribution to Buyer and Seller.

(c)    <u>Title Policy</u>.  Issue the Title Policy to Buyer.

(d)    <u>Delivery of Documents to Buyer</u>.  Deliver to Buyer any documents (or copies thereof) deposited with Title Company by Seller pursuant hereto.

(e)    <u>Delivery of Documents to Seller</u>.  Deliver to Seller any documents (or copies thereof) deposited with Title Company by Buyer pursuant hereto.

14.    **Default**.  In the event Buyer fails or refuses to perform any of Buyer's material obligations hereunder or Buyer fails to close the purchase and sale of the Property, and does not cure such failure within five (5) business days after receipt of written notice of the same from Seller, or Buyer is in default of any other material obligation under this Agreement and fails to cure the such default within five (5) business days after receipt of written notice of the same from Seller, then Seller may, as its sole and exclusive remedy, terminate this Agreement by written notice to Buyer, in which event Seller shall receive the Deposit from the Title Company as liquidated damages, this Agreement shall be of no further force and effect, and all Parties hereto shall thereupon be relieved and absolved of any further liabilities or obligations whatsoever to each other hereunder, except with respect to those liabilities or obligations hereunder which are expressly stated to survive the termination of this Agreement.  **BUYER AND SELLER AGREE THAT IT WOULD BE IMPRACTICAL OR EXTREMELY DIFFICULT TO ESTABLISH SELLER'S DAMAGES BY REASON OF BUYER'S FAILURE TO CLOSE. ACCORDINGLY, BUYER AND SELLER AGREE THAT IT IS REASONABLE AT SUCH TIME TO AWARD THE DEPOSIT TO SELLER AS "LIQUIDATED DAMAGES" AND THAT THE AMOUNT OF THE DEPOSIT IS A FAIR AND REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT SELLER WOULD SUFFER IN THE EVENT OF BUYER'S FAILURE TO CONSUMMATE THE CLOSING IN BREACH HEREOF. SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMEENT AND ANY SURVIVING BUYER OBLIGATIONS, SELLER IRREVOCABLY WAIVES THE RIGHT TO SEEK OR OBTAIN ANY OTHER LEGAL OR EQUITABLE REMEDIES, INCLUDING THE REMEDIES OF DAMAGES AND SPECIFIC PERFORMANCE FOR BUYER'S FAILURE TO CONSUMMATE THE CLOSING IN BREACH HEREOF.**

**SELLER AND BUYER ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE PROVISIONS OF THIS SECTION AGREE TO BE BOUND BY ITS TERMS.**

15. **Seller Default**. In the event Seller fails to perform Seller's material obligations hereunder, Buyer shall have the option to terminate this Agreement by written notice to Seller. In the event this Agreement is terminated due to Seller's default, the Title Company shall promptly return the Deposit to Buyer, Seller shall refund to Buyer any Deposit releases and this Agreement shall be of no further force and effect, and all Parties hereto shall thereupon be relieved and absolved of any further liabilities or obligations whatsoever to each other hereunder, except with respect to those liabilities or obligations hereunder which are expressly stated to survive the termination of this Agreement. Notwithstanding the foregoing, prior to exercising any remedy under this Section 15, Buyer shall notify Seller of the Seller default and give Seller a period of five (5) business days after such notice to cure the Seller default.

16. **Seller's Representations and Warranties**. Seller warrants and represents, to Seller's knowledge, to Buyer as of the Effective Date and as of the Closing Date:

(a) Definition of Seller's Knowledge. For the purposes of this Agreement, the term "Trustee's Knowledge" shall mean and refer only to the actual knowledge of Shelley D. Krohn, acting in her capacity as the Chapter 7 Trustee appointed to administer the Debtor's bankruptcy case. For the purposes of this Agreement, the term "FC Knowledge" shall mean and refer only to the actual knowledge of Ketan Patel, General Counsel and Head of Cleveland Office for Brookfield Properties, and shall not be construed to refer to the knowledge of any other partner, officer, director, agent, employee, or representative of such Seller, or any affiliate of such Seller. Trustee's Knowledge and FC Knowledge shall collectively be referred to as "Sellers' Knowledge".

(b) FC RTC 39 and FC RTC 20 are limited liability companies duly organized, validly existing and in good standing under the laws of the state of their organization and the state in which the Property is located. FC RTC 39 and FC RTC 20 have made all filings necessary in the state in which the Property is located to own and operate the Property. Seller has the full right, power and authority to enter into this Agreement and all documents contemplated hereby, and consummate the transaction contemplated by this Agreement. All requisite action has been taken by Seller in connection with entering into this Agreement and will be taken by Seller prior to the Closing in connection with the execution and delivery of the instruments referenced herein, and the consummation of the transaction contemplated hereby. Each of the persons and entities signing this Agreement and the other documents contemplated by this Agreement on behalf of Seller has the legal right, power and authority to bind Seller. This Agreement and all documents required hereby to be executed by Seller are and shall be valid, legally binding obligations of and enforceable against Seller in accordance with their terms.

(c) To the best of Sellers' Knowledge, Seller has not received written notice of, and has no actual knowledge of, any pending or threatened condemnation or similar proceedings, rezonings, annexations, special assessments, creation of any special districts, authorities, or other similar governmental, quasi-governmental, or administrative actions relating to the Property. No commitments have been made by Seller to any governmental entity, agency, or authority relating to the Property.

(d)     To the best of the Trustee's Knowledge, other than the Chapter 7 bankruptcy proceed currently in effect, there are no other litigation, suits, claims, mediation, or arbitration pending or, to the best of Seller's knowledge, proposed, threatened, or anticipated with respect to Seller, any matter affecting the Property, or Seller's ability to consummate the transactions contemplated in this Agreement.

(e)     With the exception of the Seller's Closing Conditions, the execution and performance of this Agreement by Seller will not require the approval or consent of, or notice to, any third party, and neither this Agreement nor the performance of Seller hereunder shall constitute a violation of or conflict with any document, contractual commitment or law applicable to Seller.

(f)     To the best of Sellers' Knowledge, except as otherwise disclosed to Buyer in the Seller Deliveries, the Lease Agreement, Title Commitment, the Survey or known by Buyer, there are no surface leases, subleases, licenses, contracts, unrecorded easements, or other agreements, written or oral, regarding the Property, or granting to any party or parties the right to use or occupy all or any portion of the Property (collectively, "Leases").  Other than Buyer who is presently occupying the Property, there are no other parties in possession of or, to the best of Seller's knowledge, entitled to possession of the Property.

(g)     To the best of Sellers' Knowledge, there are no threatened mechanics liens or notices of intent to file mechanics liens against all or any portion of the Property, and all contractors, subcontractors, materialmen, suppliers, laborers and other parties who have performed services and/or provided material to or with respect to the Property have been paid in full.

(h)     To the best of Sellers' Knowledge, Seller is the sole owner of the good, clean, free, marketable, and unencumbered title to the Property, and no third parties have any rights (including without limitation rights of first refusal or rights of first offer) or options to purchase the Property or any portion thereof.

(i)     To the best of Sellers' Knowledge, Seller has not received written notice from any governmental agency regarding any alleged violation of any applicable federal, state and/or local statutes, ordinances, rules and/or regulations, including, but not limited to, Environmental Laws (collectively, "Applicable Law(s)").

(j)     To the best of Sellers' Knowledge, Seller is not a foreign person, foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in (i) the Code and the corresponding income tax regulations, and (ii) similar provisions of state law.  Buyer has no duty to collect withholding taxes for Seller pursuant to the Foreign Investors Real Property Tax Act of 1980, as amended, or any applicable foreign, state, or local law.  Seller is not a Prohibited Person.  To Seller's knowledge, none of its investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person.  The assets Seller will transfer to Buyer under this Agreement are not the property of, and are not beneficially owned, directly or indirectly, by a Prohibited Person.  The assets Seller will transfer to Buyer under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. §1956(c)(7). "Prohibited Person" means any of the following: (1) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "Executive Order"); (2) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive

Order; (3) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") at its official website, http://www.treas.gov/offices/enforcement/ofac; (4) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (5) a person or entity that is affiliated with any person or entity identified in clause (1), (2), (3) and/or (4) above.

Seller will not cause or suffer any action to be taken which would cause any of the foregoing representations or warranties to be untrue. Seller shall immediately notify Buyer, in writing, of any event or condition known to Seller which causes a change in the facts relating to, or the truth of, any of the above representations or warranties.; provided, however, that upon such notification or upon Buyer becoming aware of such event or condition: Buyer shall have the right to terminate this Agreement by delivering written notice thereof to Seller, the Title Company shall promptly return the Deposit to Buyer, this Agreement shall be of no further force and effect, and all Parties hereto shall thereupon be relieved and absolved of any further liabilities or obligations whatsoever to each other hereunder, except with respect to those liabilities or obligations hereunder which are expressly stated to survive the termination of this Agreement. To the extent that any of the events or conditions described in such notification are caused as a result of a breach by Seller of this Agreement or because of Seller's fraud, misrepresentation, Buyer shall be entitled to all of the rights and remedies set forth in <u>Section 14</u>. All representations and warranties made in this Agreement by Seller shall survive Closing for eighteen (18) months.

 17. Buyer's Representations and Warranties. Buyer warrants and represents, to Buyer's knowledge, to Seller as of the Effective Date and as of the Closing Date:

 (a) Buyer has the full right, power and authority to enter into this Agreement and all documents contemplated hereby, and consummate the transaction contemplated by this Agreement. All requisite action has been taken by Buyer in connection with entering into this Agreement and will be taken by Buyer prior to the Closing in connection with the execution and delivery of the instruments referenced herein, and the consummation of the transaction contemplated hereby. Each of the persons and entities signing this Agreement and the other documents contemplated by this Agreement on behalf of Buyer has the legal right, power and authority to bind Buyer. This Agreement and all documents required hereby to be executed by Buyer are and shall be valid, legally binding obligations of and enforceable against Buyer in accordance with their terms.

 18. **Operation of Property**. The Parties covenant that, so long as the Agreement remains in effect:

 (a) Except as expressly set forth in this Agreement, the Parties shall not enter into, amend, extend, or otherwise modify any surface related Leases, contracts, or other agreements, whether written or oral, that will survive the Closing or otherwise affect the use, operation, or enjoyment of the Property after the Closing, in each case without the other Party's prior written consent, which may be withheld in that Party's sole and absolute discretion.

 (b) The Parties will keep the Property, or will cause the Property to be, fully insured against all usual risks and will maintain, or cause to be maintained, in effect all insurance policies now maintained on the Property, up to and including the Closing Date.

(c)     Except as expressly set forth in this Agreement, the Parties shall not create or consent to the creation of any lien, encumbrance, or other matter affecting title to the Property without the other Party's prior written consent, which may be withheld in that Party's sole and absolute discretion.

(d)     The Parties shall not take, or fail to take, any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated.

(e)     The Parties shall not seek or consent to any rezoning, annexation, or other action, or entitlement related to the Property, or its use or taxation, or to the inclusion of the Property within any special district, authority, or similar governmental or quasi-governmental jurisdiction, without the other Party's prior written consent, which may be withheld in that Party's sole and absolute discretion.

(f)     The Parties shall promptly notify the other Party of any change as to knowledge of any condition with respect to the Property, or any portion thereof, or of any event or circumstance of which the Parties obtain knowledge subsequent to the Effective Date which makes any of their representations or warranties untrue, it being expressly understood that a Party's obligation to provide such information shall in no way relieve it of any liability for a breach of any of its representations, warranties, covenants or agreements under this Agreement.

(g)     The Parties shall continue to use and operate the Property in compliance with, and shall perform all obligations pursuant to, all Applicable Laws and matters of record.

19.     **Condemnation**.  Seller shall notify Buyer if Seller receives written notice of, or becomes otherwise aware of, any eminent domain, condemnation, or similar proceedings, or negotiations in lieu thereof that would result in a taking of any portion of the Property or access to the Property (collectively, "Condemnation"), Seller shall promptly provide written notice to Buyer of such Condemnation. In the event of such a Condemnation, either party shall have the right to terminate this Agreement by written notice to the other party within ten (10) days of notifying Buyer of such Condemnation and the Deposit and any Deposit Releases shall be refunded to Buyer. If this Agreement is not so terminated: (a) the Purchase Price shall not be affected, (b) if a Condemnation award is paid prior to Closing, then at Closing, Seller shall pay such award to Buyer, (c) at Closing, Seller shall assign all Condemnation claims and awards to Buyer, and (d) Buyer shall have the right to negotiate the Condemnation award on Seller's behalf, and to contest the Condemnation of the Property or access thereto and/or the award resulting therefrom.

20.     **Casualty**.  Seller shall be responsible for all risks of damage, loss, or injury to the Property and for all property-owner liability prior to Closing.  If, prior to Closing, the Property or any part thereof shall be destroyed or materially damaged by fire, flood, wind or other casualty, in whole or in part (collectively, a "Casualty"), either party shall have the right to terminate this Agreement by written notice to the other within ten (10) days of such casualty and the Deposit and any Deposit Releases shall be refunded to Buyer.  If this Agreement is not so terminated: (a) the Purchase Price shall not be affected, except that the amount of any deductible shall be a credit against the Purchase Price, (b) Buyer shall be entitled to receive all of the insurance proceeds or to settle the loss under all policies of insurance applicable to the destruction or damage, (c) if insurance proceeds are paid to Seller prior to Closing, then at Closing, Seller shall pay such proceeds to Buyer or at Buyer's option such proceeds shall be a credit against the Purchase Price,

-13-

and (d) Seller shall, at Closing and thereafter, execute and deliver to Buyer all required proofs of loss, assignments of claims, and other similar items related to the Casualty.

21.    **Notice**.    All notices, consents, reports, demands, requests and other communications required or permitted hereunder ("Notices") shall be in writing, and shall be: (a) personally delivered with a written receipt of delivery; (b) sent by a nationally recognized overnight delivery service requiring a written acknowledgement of receipt or providing a certification of delivery or attempted delivery; or (c) sent by email of a PDF document followed by a copy thereof transmitted to the recipient by one of the means described in subsections (a) or (b).  All Notices shall be deemed effective when actually received as documented in a delivery receipt; provided, however, that if the Notice was sent by overnight courier or mail as aforesaid and is affirmatively refused or cannot be delivered during customary business hours by reason of the absence of a signatory to acknowledge receipt, or by reason of a change of address with respect to which the addressor did not have either knowledge or written notice delivered in accordance with this Section, then the first attempted delivery shall be deemed to constitute delivery.  Each Party shall be entitled to change its address for Notices from time to time by delivering to the other Party Notice thereof in the manner herein provided for the delivery of Notices.  All Notices shall be sent to the addressee at its address set forth below:

|  |  |
|---|---|
| If to Buyer: | Regional Transportation Commission of S. Nev.<br>600 S. Grand Central Parkway, Suite 350<br>Las Vegas, Nevada 89106<br>Attn: David Clyde |
|  | with copy to: |
|  | Holland & Hart LLP<br>9555 Hillwood Drive, 2nd Floor<br>Las Vegas, Nevada 89134<br>Attn: Gregory Gilbert |
| If to Trustee: | Shelley D. Krohn, Chapter 7 Trustee<br>7469 W. Lake Mead Boulevard, Suite 170<br>Las Vegas, Nevada 89128 |
|  | with copy to: |
|  | Jacob L. Houmand, Esq.<br>Houmand Law Firm, Ltd.<br>9205 West Russell Road, Building 3<br>Suite 240<br>Las Vegas, Nevada 89148 |
| If to FC RTC 39<br>Or FC RTC 20: | Ketan Patel<br>General Counsel and Head of Cleveland Office<br>Brookfield Properties<br>127 Public Square, Suite 3200 |

-14-

Cleveland, Ohio 44144-1229

22.    **Commissions**.  Except for the commission payable to Cushman & Wakefield ("Seller's Broker") solely by Seller at Seller's sole cost and expense, Buyer and Seller each represent and warrant that they did not engage the services of any real estate broker or person that may claim a commission or finder's fee with respect to this transaction. Buyer and Seller shall not be responsible for any commissions, finder's fees or similar compensation to any other broker or similar person.  This covenant shall survive Closing or the earlier termination of this Agreement.

23.    **Other Matters**.

(a)    Confidentiality.  Seller shall not disclose the underlying identity of Buyer (that Buyer is affiliated with the Regional Transportation Commission) unless given express written approval by Buyer. Buyer expressly consents to the Trustee attaching this Agreement as an exhibit to a motion that will be filed with the Bankruptcy Court to obtain approval of the sale of the bankruptcy estate's interest in the Property pursuant to 11 U.S.C. § 363.  Buyer also authorizes the Trustee to disclose information concerning the sale of the Property to certain creditors in the Debtor's bankruptcy case to facilitate approval of the sale of the Property by the Bankruptcy Court.  Except as set forth in this section, Seller shall not disclose any confidential information in the event of the revocation or termination of this Agreement, unless Seller is required to do so by a court of competent jurisdiction or is given written permission to do so by Buyer.

(b)    Governing Law and Venue.  This Agreement shall be governed, construed, interpreted, enforced and the relations between the parties determined in accordance with the laws of the State of Nevada, without regard to its choice of law rules.  The Parties hereto consent to the exclusive jurisdiction and venue of the federal, state and local courts located in Clark County, Nevada.  In the event of any controversy, claim or dispute between the parties affecting or relating to the subject matter or performance of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party, all of its reasonable expenses, including reasonable attorneys' fees.

(c)    Entire Agreement.  This Agreement including its Exhibits shall constitute the entire agreement between Seller and Buyer and supersedes any other written or oral agreements between Seller and Buyer.

(d)    Amendments and Waiver.  This Agreement may be modified only by written agreement executed by both Parties. No waiver of any of the provisions of this Agreement shall be valid unless in writing and signed by the Party against whom it is sought to be enforced. No waiver of any provision shall be deemed a continuing waiver of such provision or of this Agreement.

(e)    Successors and Assigns.  This Agreement shall inure to the benefit of and bind the Parties hereto and their respective successors and assigns.

(f)    Counterparts; Facsimile.  This Agreement may be executed in one or more counterparts, each of which will constitute an original, and all of which together shall constitute one and the same agreement.  Executed copies hereof may be delivered by email of a PDF document, and, upon receipt, shall be deemed originals and binding upon the Parties hereto.

-15-

Without limiting or otherwise affecting the validity of executed copies hereof that have been delivered by email, the Parties will use their best efforts to deliver originals as promptly as possible after execution.

(g)    <u>Partial Invalidity</u>.  If any provision of this Agreement is determined to be unenforceable, such provision shall be reformed and enforced to the maximum extent permitted by Applicable Law.  If it cannot be reformed, it shall be stricken from and construed for all purposes not to constitute a part of this Agreement, and the remaining portions of this Agreement shall remain in full force and effect and shall, for all purposes, constitute this entire Agreement.

(h)    <u>Recitals and Exhibits</u>.  All Recitals to this Agreement and Exhibits attached hereto are hereby incorporated herein by reference as though set out in full herein.

(i)    <u>Time of the Essence</u>.  Time is of the essence of this Agreement. If any deadline falls on a Saturday, Sunday, or federal or Nevada state holiday, such deadline will be extended to the next day that is not a Saturday, Sunday, or federal or Nevada state holiday.

(j)    <u>Parties' Expenses</u>.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incurred in the performance of its obligations under this Agreement or otherwise in connection with the transactions contemplated in this Agreement.

(k)    <u>Relationship of Parties</u>.  Buyer and Seller acknowledge and agree that the relationship established between the Parties pursuant to this Agreement is only that of a seller and a purchaser of property.  Neither Buyer nor Seller is, nor shall either hold itself out to be, the agent, employee, joint venturer or partner of the other Party.

(l)    <u>Joint and Several Liability</u>.  If Seller consists of two or more persons or entities, then such parties shall be jointly and severally liable for Seller's covenants, representations, warranties and other obligations under this Agreement and requests or demands from any one person or entity comprising Seller shall be deemed to have been made of all such persons or entities and Buyer shall be entitled to rely on notice or communication from any one person or entity to bind Seller.

(m)    <u>Construction of Agreement</u>.  All Parties hereto acknowledge that they have had the benefit of independent counsel with regard to this Agreement and that this Agreement has been prepared as a result of the joint efforts of all Parties and their respective counsel.  Accordingly, all Parties agree that the provisions of this Agreement shall not be construed or interpreted for or against any Party hereto based upon authorship.

(n)    <u>Attorney's Fees</u>.  In the event of litigation or arbitration arising out of or related to this Agreement, the non-prevailing Party shall, in addition to all other relief granted or awarded by the court or arbitrator, pay the prevailing Party's reasonable attorneys' fees, charges and disbursements (including those of in-house counsel) and expert witnesses fees and all costs incurred by reason of such action or arbitration and those incurred in preparation thereof at both the trial or arbitration and appellate levels.

(o)    <u>Further Assurances</u>.  Buyer and Seller will make, execute, and deliver such documents and undertake such other and further acts as may be reasonably necessary to complete the transaction contemplated herein.

(p)    <u>Non-Binding</u>.  No Party shall have any legal rights or obligations with respect to any other Party, and no Party should take any action or fail to take any action in detrimental reliance, until this Agreement is executed by both Seller and Buyer.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER**

SHELLEY D. KROHN, the Chapter 7 Trustee for

the bankruptcy estate of Las Vegas Land Partners,

LLC and 100% member of WINK ONE LLC,

a Delaware limited liability company

By:_____
Name:_____
Title:_____

FC RTC 39, LLC,

a Delaware limited liability company

By:_____
Name:_____
Title:_____

FC RTC 20, LLC,

a Delaware limited liability company

By:_____
Name:_____
Title:_____

**BUYER**

REGIONAL TRANSPORTATION COMMISSION

OF SOUTHERN NEVADA

By:_____
Name:_____
Title:_____

## <u>ACCEPTANCE BY TITLE COMPANY</u>

First American Title Insurance Company referred to in this Agreement as the "**<u>Title Company</u>**", hereby acknowledges receipt of the Deposit in the amount of $_____together with one (1) fully executed counterpart of this Agreement. Title Company certifies that it has received and understands this Agreement and hereby accepts the obligations of Title Company and Title Company as set forth herein, including, without limitation, its agreement to hold the Deposit and dispose of same, in strict accordance with the terms and provisions of this Agreement.

**TITLE COMPANY:**

FIRST AMERICAN TITLE INSURANCE COMPANY

By:_____

Name:_____

Title:_____

Date:_____

## EXHIBIT A

### Legal Description of the Real Property

Being a portion of the Southwest Quarter (SW 1/4) of Section 34, Township 20 South, Range 61 East, M.D.M., City of Las Vegas, Nevada described as follows: Commencing at the intersection of First Street and Bonneville Avenue; thence along the centerline of Bonneville Avenue South 62°04'40" East, a distance of 50.01 feet; thence departing said centerline South 27°55'20" West, a distance of 40.00 feet to the point of beginning being on the Southerly line of Bonneville Avenue. Thence from said point of beginning along said Southerly line South 62°04'40" East, 280.00 feet to the Southwesterly line of spandrel dedicated in Document No. 20071011:003371, Official Records, Clark County, Nevada; thence along said line Southeasterly along a tangent curve to the right, having a radius of 10.00 feet, through a central angle of 89°59'10", for an arc length of 15.71 feet to the Westerly line of Casino Center Boulevard; thence along said Westerly line South 27°54'30" West, a distance of 379.98 feet to the Northwesterly line of spandrel dedicated in Document No. 20010718:01127, Official Records, Clark County, Nevada; thence along said line Southwesterly along a tangent curve to the right, having a radius of 10.00 feet; through a central angle of 90°01'08", for an arc length of 15.71 feet to the Northerly line of Garces Avenue; thence along said Northerly line North 62°04'22" West, a distance of 279.99 feet to the Northeasterly line of Spandrel dedicated in Document No. 20071011:003371 Official Records, Clark County, Nevada; thence along said line Northwesterly along a tangent curve to the right, having a radius of 10.00 feet, through a central angle of 89°58'48", for an arc length of 15.70 feet to the Easterly line of First Street; thence along said Easterly line North 27°54'26" East, a distance of 379.95 feet to the Southeasterly line of spandrel dedicated in Document No. 20010718:01127, Official Records, Clark County, Nevada; thence along said line Northeasterly along tangent curve to the right, having a radius of 10.00 feet, through a central angle of 90°00'54", for an arc length of 15.71 feet to the point of beginning.

That certain 20 foot alley located in Block 9 of Clark's Las Vegas Townsite, as shown by map thereof thereof on file in Book 1 of Plats, Page 37, in the Office of the County Recorder of Clark County, Nevada, as vacated by that certain Order of Vacation recorded October 30, 2007 in Book 20071030 as Instrument No. 01765

A.P.N. 139-34-301-008

## EXHIBIT B

### DEED

APN(s):

**RECORDING REQUESTED BY AND**
**WHEN RECORDED, MAIL TO:**
Holland & Hart LLP
9555 Hillwood Drive
2nd Floor
Las Vegas, Nevada 89134
Attention: Greg Gilbert

**WHEN RECORDED MAIL TO AND**
**MAIL TAX STATEMENT TO:**
REGIONAL TRANSPORTATION COMMISSION
OF SOUTHERN NEVADA
600 S. GRAND CENTRAL PKWY.
STE. 350
LAS VEGAS, NV 89106

**Affix R.P.T.T.: EXEMPT 2**

### GRANT, BARGAIN AND SALE DEED

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, _____ ("**Grantor**") do hereby GRANT, BARGAIN and SELL to **REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA** ("**Grantee**"), the real property situated in the County of Clark, State of Nevada, described in **Exhibit "A"** attached hereto and incorporated herein by this reference (the "**Property**");

TOGETHER WITH all rights, entitlements, privileges, easements, tenements, hereditaments and appurtenances to the Property, and any reversions, remainders, rents, issues or profits thereof, and all right, title, and interest of Grantor, if any, in and to any land lying in the bed of any street, road, alley or right-of-way, open or closed, adjacent to or abutting said Property.

SUBJECT ONLY TO nondelinquent taxes and assessments and the exceptions set forth on Exhibit "B" hereto.

TO HAVE AND TO HOLD all and singular the premises, together with the appurtenances, if any, unto the said Grantee and to its successors and assigns forever.

*[Signature Page Follows]*

22

Dated this ___ day of _____, 2024, to be effective upon recording.

**<u>GRANTORS</u>:**

SHELLEY D. KROHN, the Chapter 7 Trustee for the bankruptcy estate of Las Vegas Land

Partners, LLC and 100% member of WINK ONE LLC,

a Delaware limited liability company

By:_____

Name:_____

Title:_____

STATE OF NEVADA                    )

COUNTY OF CLARK                    )

This instrument was acknowledged before me on _____, 2024, by

_____, as the Chapter 7 Trustee for the bankruptcy estate of Las Vegas Land

Partners, LLC and 100% member of WINK ONE LLC, a Delaware limited liability company.

_____

Notary Public

My Commission Expires: _____

FC RTC 39, LLC,

a Delaware limited liability company

By:_____

Name:_____

Title:_____


STATE OF _____                )

COUNTY OF _____              )

This instrument was acknowledged before me on _____, 2024, by

_____, as _____ of FC RTC 39, LLC, a Delaware limited liability

company.


_____

Notary Public

My Commission Expires: _____

Signature Page – Deed

FC RTC 20, LLC,

a Delaware limited liability company

By:_____
Name:_____
Title:_____

STATE OF \_\_\_\_\_            )

COUNTY OF \_\_\_\_\_           )

This instrument was acknowledged before me on _____, 2024, by

_____, as _____of FC RTC 20, LLC, a Delaware limited liability

company.

_____
Notary Public
My Commission Expires: _____

Signature Page – Deed

EXHIBIT A

LEGAL DESCRIPTION

EXHIBIT B

EXCEPTIONS

**[Intentionally Omitted]**

## EXHIBIT C

### BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT ("**Bill of Sale**") is made this \_\_\_\_ day of _____, 2024 ("**Effective Date**"), SHELLEY D. KROHN, the Chapter 7 Trustee for the bankruptcy estate of Las Vegas Land Partners, LLC and 100% member of WINK ONE LLC, a Delaware limited liability company ("Wink One"); FC RTC 39, LLC, a Delaware limited liability company ("FC RTC 39"); and FC RTC 20, LLC, a Delaware limited liability company ("FC RTC 20 ") (collectively, "**Seller**"), and REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA ("**Buyer**")

W I T N E S S E T H:

WHEREAS, Seller and Buyer entered into that certain Purchase and Sale Agreement with Escrow Instructions, dated _____, 2024 ("**Agreement**") with respect to the sale of certain Property identified on **Exhibit 1** attached hereto, the improvements located thereon, and Personal Property related thereto. Any term with its initial letter capitalized and not otherwise defined herein shall have the meaning set forth in the Agreement.

WHEREAS, pursuant to the Agreement, Seller is obligated to transfer to Buyer the Personal Property (collectively, the "**Transferred Property**").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller does hereby absolutely, irrevocably and unconditionally give, grant, bargain, sell, transfer, set over, assign, convey, release, confirm, and deliver to Buyer all of the Transferred Property.

1.      Seller hereby covenants that Seller will, at any time and from time to time upon written request therefor, execute and deliver to Buyer, Buyer's successors, nominees or assigns, such documents as Buyer or they may reasonably request in order to fully assign and transfer to and vest in Buyer or Buyer's successors, nominees and assigns, and protect Buyer's or their right, title and interest in and to all of the Transferred Property and rights of Seller intended to be transferred and assigned hereby, or to enable Buyer, Buyer's successors, nominees and assigns to realize upon or otherwise enjoy such rights and property.

2.      Seller hereby represents and warrants that it is the lawful owner of all of the Personal Property, free and clear of all mortgages, claims, liens, security interests, or encumbrances of any nature whatsoever, that Seller has the right to sell and transfer such Transferred Property to Buyer, and that Seller will warrant and defend the same against the claims and demands of any and all persons, firms and entities claiming or asserting claims by, through or under Seller.

3.      SELLER IS SELLING AND BUYER IS PURCHASING SUCH TRANSFERRED PROPERTY IN ITS "AS IS WITH ALL FAULTS" CONDITION AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EITHER EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR BROKERS AS TO ANY

MATTERS CONCERNING SUCH TRANSFERRED PROPERTY, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

4.      This Bill of Sale and the obligations of the parties hereunder shall survive the closing of the transactions referred to in the Agreement and shall be binding upon and inure to the benefit of Seller and Buyer, their respective legal representatives, successors and assigns.

5.      This Bill of Sale (a) may be executed in counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument, (b) shall be governed by and construed in accordance with the laws of the State of Nevada, and (c) may not be modified or amended except by written agreement signed by both Seller and Buyer.

6.      If any action or proceeding is commenced by either party to enforce its rights under this Bill of Sale, the substantially prevailing party in such action or proceeding shall be awarded all reasonable costs and expenses incurred in such action or proceeding, including reasonable attorneys' fees and costs (including the cost of in-house counsel and appeals), in addition to any other relief awarded by the court.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties have executed this Bill of Sale as of the Effective Date.

**SELLER**

SHELLEY D. KROHN, the Chapter 7 Trustee for the bankruptcy estate of Las Vegas Land Partners, LLC and 100% member of WINK ONE LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____


FC RTC 39, LLC,

a Delaware limited liability company

By:_____
Name:_____
Title:_____


FC RTC 20, LLC,

a Delaware limited liability company

By:_____
Name:_____
Title:_____


**BUYER**

REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA

By:_____
Name:_____
Title:_____

## Exhibit 1 to Bill of Sale

## LEGAL DESCRIPTION

Being a portion of the Southwest Quarter (SW 1/4) of Section 34, Township 20 South, Range 61 East, M.D.M., City of Las Vegas, Nevada described as follows: Commencing at the intersection of First Street and Bonneville Avenue; thence along the centerline of Bonneville Avenue South 62°04'40" East, a distance of 50.01 feet; thence departing said centerline South 27°55'20" West, a distance of 40.00 feet to the point of beginning being on the Southerly line of Bonneville Avenue. Thence from said point of beginning along said Southerly line South 62°04'40" East, 280.00 feet to the Southwesterly line of spandrel dedicated in Document No. 20071011:003371, Official Records, Clark County, Nevada; thence along said line Southeasterly along a tangent curve to the right, having a radius of 10.00 feet, through a central angle of 89°59'10", for an arc length of 15.71 feet to the Westerly line of Casino Center Boulevard; thence along said Westerly line South 27°54'30" West, a distance of 379.98 feet to the Northwesterly line of spandrel dedicated in Document No. 20010718:01127, Official Records, Clark County, Nevada; thence along said line Southwesterly along a tangent curve to the right, having a radius of 10.00 feet; through a central angle of 90°01'08", for an arc length of 15.71 feet to the Northerly line of Garces Avenue; thence along said Northerly line North 62°04'22" West, a distance of 279.99 feet to the Northeasterly line of Spandrel dedicated in Document No. 20071011:003371 Official Records, Clark County, Nevada; thence along said line Northwesterly along a tangent curve to the right, having a radius of 10.00 feet, through a central angle of 89°58'48", for an arc length of 15.70 feet to the Easterly line of First Street; thence along said Easterly line North 27°54'26" East, a distance of 379.95 feet to the Southeasterly line of spandrel dedicated in Document No. 20010718:01127, Official Records, Clark County, Nevada; thence along said line Northeasterly along tangent curve to the right, having a radius of 10.00 feet, through a central angle of 90°00'54", for an arc length of 15.71 feet to the point of beginning.

That certain 20 foot alley located in Block 9 of Clark's Las Vegas Townsite, as shown by map thereof thereof on file in Book 1 of Plats, Page 37, in the Office of the County Recorder of Clark County, Nevada, as vacated by that certain Order of Vacation recorded October 30, 2007 in Book 20071030 as Instrument No. 01765

A.P.N. 139-34-301-008

30785050_v2

30785050_v4